# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF JALEN PROFT,
by Mary Jane Proft as Special Administrator,

       Plaintiff,

Case No: 24-CV-982

v.

WASHINGTON COUNTY, MARTIN SCHULTEIS,
BRIAN WEDDIG, SEAN WOLFGRAM, ANDREA
BRYANT, GLORIA BAERBER, TIM HUYBERS, JOHN
DOES 1-10 and ABC INSURANCE COMPANY

       Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT

Defendants Washington County (the "County"), Martin Schulteis, Brian Weddig, Sean Wolfgram, Andrea Bryant, Gloria Baerber, and Tim Huybers, by their attorneys Crivello, Nichols & Hall, S.C., and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submit this Brief in Support of their Motion for Summary Judgment.

## FACTUAL BACKGROUND[1]

Jalen Proft was an inmate at Washington County Jail ("WCJ") on August 17, 2021. (PFOF 44-51.) On that date, without any warning or notice, Proft was assaulted by another inmate, George Telford, who was assigned to the same housing unit, Adult D Pod. (Dkt. 40, ¶ 35; PFOF 41, 52-61, 63-95.) The assault began at 1:24 p.m. (PFOF 82.) Officers Weddig, Wolfgram, Bryant, Baerber, and Huybers were each on duty as correctional officers at WCJ on that date, and each was located in the Control Room or the hallway separating the Control Room from Adult Pod D at the time the assault

---

[1] All material facts are set forth in detail in Defendants' Proposed Findings of Material Fact (hereafter "PFOF"), which is being filed contemporaneously herewith.

began. (PFOF 1- 5, 83, 86-94, 96-106.) The first officer to see the assault was Officer Baerber, who saw Proft crawl out of his cell with his eyes swollen at 1:28 p.m. (PFOF 96.) She immediately called a "Code Red," the emergency procedure in place to summon all available staff to assist with the emergency. (PFOF 99.) By 1:29 p.m., multiple officers entered the housing unit, ordered Telford to lock into his cell, and then responded to Proft. Proft later passed away from the injuries he sustained from Telford's assault. (PFOF 107-111.)

## LEGAL STANDARD

When reviewing motions for summary judgment, courts must decide whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict; if not, the motion must be granted, and the case dismissed. *Palucki v. Sears Roebuck & Co.*, 879 F.2d 1568, 1572-73 (7th Cir. 1989). Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also U.S. v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022).

## ARGUMENT

**I.    PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS BASED ON DEFENDANTS' ALLEGED "DELIBERATE INDIFFERENCE" FAIL ON THEIR MERITS.**

### A.    Count I –"Deliberate Indifference" to Risk of Assault.

In Count I of the Second Amended Complaint, Plaintiff asserts a Fourth[2] and Fourteenth Amendment claim against Officers Baerber, Bryant, Weddig, Huybers, and Wolfgram for their alleged "deliberate indifference." (Dkt. 40, pp. 25-27). However, the objective reasonableness standard established in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) applies to Fourteenth Amendment failure-to-protect claims brought by pretrial detainees. *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (citing *Kemp v. Fulton Cnty.*, 27 F.4th 491, 495 (7th Cir. 2022)).

Importantly, the Constitution requires officers to act responsibly and reasonably under the circumstances that confront them, but it does not require "that they anticipate every potential danger facing a detainee." *Id.* (citing *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)). "[A]n assessment of objective reasonableness must be made 'on the facts and circumstances of each particular case' and 'from the perspective of a reasonable officer on the scene, including what the officer knew at the time.'" *Id.* at 842 (quoting *Kingsley*, 576 U.S. at 397). Under the objective reasonableness standard, Plaintiff has the burden to prove that:

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the

---

[2] To the extent that Plaintiff raises the Fourth Amendment, it is at best duplicative. Claims alleged by pretrial detainees asserting a failure to protect arise under the Fourteenth Amendment, not the Fourth Amendment. *See Thomas*, 39 F.4th at 841. But even if the Fourth Amendment is considered, claims under the Fourth and Fourteenth Amendments are both subject to the same objective reasonableness standard. *See, e.g., Jump v. Vill. of Shorewood*, 42 F.4th 782, 792-3 (7th Cir. 2022). Therefore, Defendants do not substantively address the Fourth Amendment herein.

defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

*Id.* at 841.

Although Plaintiff need not establish the subjective element of Defendants' actual awareness of the level of the risk, the third element requires Plaintiff to point to evidence showing that a specific defendant "was on notice of a serious risk of harm" to Proft. *Thomas,* 39 F.4th at 841-42; *see also Pittman v. Madison Cnty., Ill.*, 108 F.4th 561, 569-570 (7th Cir. 2024). Put another way, Plaintiff must establish that "a reasonable officer in a defendant's circumstances would have appreciated the high degree of risk the detainee was facing." *Id.* at 841. Further, the specific risk a reasonable officer would appreciate "must be somehow 'specific to a detainee, and not a mere general risk of violence.'" *Id.* at 843 (quoting *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005)) (noting that a plaintiff cannot establish an appreciable risk of harm "solely based on his placement in the Jail's general population because the 'general risks of violence in prison' confront virtually every detainee."). This is because "[t]he unfortunate reality is that jails and prisons are dangerous places inhabited by violent people." *Id.* at 842 (citing *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008)).

Two recent cases are illustrative of the type of evidence needed to show notice of a specific risk of harm. In *Thomas v. Dart*, the plaintiff asserted a Fourteenth Amendment failure-to-protect claim based on allegations that the jail's intake clerks suppressed information regarding his PTSD condition; that he was placed in the jail's general population, which he claimed put him at a substantial risk harm because his PTSD made him vulnerable; and that the intake clerks failed to take reasonable measures to abate that risk, and instead placed him in the general population. The Seventh Circuit held that even if true, such allegations failed to state a viable claim. *Thomas*, 39 F.4th at 842. The court explained that "[w]ithout more, however, simply being housed in the Jail's general population, even while suffering from PTSD, is not a particular enough risk in the failure-to-protect context." *Id.*

Similarly, in *Kemp v. Fulton County*, the inmate (Kemp) was housed with three other detainees, and they all "lived together without incident for several months." *Kemp*, 27 F.4th at 492-3. Kemp then got into an argument with one detainee, which led another detainee to threaten Kemp. *Id.* at 493. Kemp did not tell the corrections officer, Officer Burget, about the threat when Burget came through the unit on rounds. Instead, Kemp decided to violently confront the other detainees. The detainees then assaulted Kemp, and the "beating lasted only a few minutes." *Id.* Kemp yelled for help, but no officers responded. After the beating ended, the assailants told Kemp "they'd 'all be cool,'" but 20 minutes later they again attacked Kemp. *Id.* This second fight left Kemp motionless on the floor, where a different corrections officer, Officer Williams, found him a few minutes later while conducting rounds. *Id.*

Officer Burget was patrolling the jail while the attacks were occurring. *Kemp*, 27 F.4th at 493. Importantly, Burget suffered from 60% hearing loss in one ear and 40% hearing loss in his other ear. *Id.* Burget had a prescription hearing aid for one ear, but he had not used it for six months and was not wearing it at the time of the assault. *Id.* Kemp contended that Burget would have heard his cries for help if he had been wearing his hearing aid. *Id.* Kemp also asserted that Burget was standing in a location where someone with better hearing would have heard the fight. *Id.* Based on those allegations, Kemp claimed that Burget "intentionally chose not to wear his hearing aid" and that this should satisfy the first element of the objective reasonableness test. *Id.* at 497.

The Seventh Circuit rejected Kemp's position, noting that there was no evidence showing that Burget's hearing impairment and decision not to wear his hearing aid caused Kemp's injuries. *Id.* "To the contrary, Burget had done his job without his hearing aid for six months." *Id.* Moreover, the record was devoid of evidence showing that a person with unimpaired hearing would have been alerted to the fight. To the contrary, evidence in the record showed that the jail was often noisy, making it difficult for officers to overhear what is happening in other parts of the building. *Id.* at 493. Further,

at least three other officers were in the vicinity of the attack, and none of them heard any "telltale noise." *Id.* at 493-4. And Officer Williams only heard sounds of a fight as she was walking toward the block in question during her rounds. *Id.* at 494.

More broadly, the *Kemp* Court also pointed out that there was no evidence that any officer was on notice of a serious risk of harm to Kemp. *Id.* It was undisputed that Kemp never reported his argument with the other inmates or the fact that they threatened him. All four inmates "had cohabited peacefully for months" prior to the assault. *Id.* Accordingly, Kemp failed to adduce any evidence that officers should have been on notice of the type of particularized and substantial risk to Kemp's safety that is required to prevail under the Fourteenth Amendment. *Id.*

### 1. Officers Gloria Baerber and Andrea Bryant

The claim against Officers Baerber and Bryant fails on each element of the objective reasonableness test. In the six weeks following Telford's arrival at WCJ, Officers Baerber and Bryant did not receive any information or make any observations suggesting that Telford may have any violent propensities towards correctional staff or inmates. (PFOF 59-60.) On August 17, 2021, neither Officer Baerber nor Officer Bryant was assigned to the Adult Pod Control Room. (PFOF 74, 84.) At approximately 1:20 p.m. that day, Officer Bryant arrived in the Control Room to get an inmate for a court appearance. (PFOF 73-74, 79.) At 1:24 p.m., Officer Baerber entered the Control Room because she was also preparing to escort an inmate to a court appearance. (PFOF 83-84.) Also at 1:24 p.m., Telford began assaulting Proft in Proft's cell. (PFOF 82.) Officer Bryant remained in the Control Room speaking with Officers Baerber, Wolfgram, Weddig, and Huybers for less than a minute, before exiting to the hallway at approximately 1:26 p.m. (PFOF 86.) About 30 seconds later, Officer Baerber exited to the same area of the hallway at 1:27 p.m. (PFOF 87.)

At approximately 1:27 p.m., while in the hallway between the Control Room and the vestibule to Adult Pods B, C, and D, Officers Baerber and Bryant began placing handcuffs and belly chains on

the inmates they were going to escort to court. (PFOF 88.) It was at this point, only three minutes after Telford began assaulting Proft, that Officer Bryant heard faint yelling and could not tell where it was coming from. (PFOF 89.) Officer Bryant did not ignore the sounds; instead, she looked into Adult D Pod to investigate from her position in the hallway. (PFOF 90.) But she only saw some inmates walking around the dayroom, none of whom appeared to be reacting to any situation, and she did not see any disturbance. (PFOF 85, 90.) Despite not seeing anything amiss, Officer Bryant continued to investigate. She told Officer Baerber that she thought something was going on in the housing unit but she could not see anything wrong. (PFOF 91.) Officer Baerber, who had not heard anything, looked into Adult D Pod from the hallway and also saw nothing amiss and no one in distress. (PFOF 85, 92.) Officer Bryant also told Officers Weddig and Wolfgram in the Control Room that she heard yelling and thought there may be a fight. (PFOF 93.)

Now approximately 1:28 p.m., Proft and Telford spilled out of the doorway of Proft's cell with Telford on top of Proft. (PFOF 95.) At almost this exact same time, Officer Baerber saw Proft crawl out of his cell with his eyes swollen. (PFOF 96.) Officer Baerber immediately called a "Code Red, Fight in Adult D Pod," which aired over the radios at 1:28:19 p.m. (PFOF 99.) At the same time that Officer Baerber called the Code Red, Officer Bryant also saw Proft and Telford coming out of Proft's cell. (PFOF 97.) And because they were in the process of securing inmates to escort to court appearances, Officers Baerber and Bryant then took those inmates to secure locations and away from the incident in Adult D Pod. (PFOF 104-105.)

Based on this record, Plaintiff's claim fails on the first and second elements, because neither Officer Baerber nor Officer Bryant made any intentional decisions regarding Proft's conditions of confinement, let alone a decision that put Proft at a substantial risk of serious harm. To the extent that Plaintiff asserts in its operative complaint that the defendant officers were deliberately indifferent "to the classification of inmates" (Dkt. 40, ¶ 96), neither Officer Baerber nor Officer Bryant classified

Proft or Telford. (PFOF 48, 56.) There is no evidence that either Officer Baerber or Officer Bryant was aware of any of the information relied upon by the classification officers who classified Proft and Telford. Regardless, even if it is assumed that Officers Baerber and Bryant were aware of those details, it was confirmed during the classifications that neither Proft nor Telford had any known past or present serious behavior issues while incarcerated and neither had any known gang affiliation. (PFOF 48, 56.) Further, the only "known enemy" of Proft was someone named Zach Hottenstein—but no one by that name was incarcerated at WCJ in August 2021. (PFOF 48-49.)

While Officer Baerber completed both Proft's and Telford's respective bookings into WCJ (PFOF 45, 53), she did not receive any information or observe anything during those bookings that would put her on notice of any risks at all, let alone some particularized risk specific to Telford or Proft as is required to prevail under the Fourteenth Amendment. *See Thomas,* 39 F.4th at 843; *Budz,* 398 F.3d at 914-915. Neither man displayed any behavior that suggested he posed a risk of assault to staff or others. (PFOF 45-46, 53-54.) Similarly, neither man displayed any notable behavior, they did not talk of threats of harm toward others, neither was acting aggressively, and both of their moods appeared normal for the situation. (PFOF 47, 55.) And in the six weeks of Telford's incarceration prior to the assault, he had only had minor rules infractions, including sleeping on his mattress under his bunk, not standing for headcount, and not wearing his uniform as required. (PFOF 61.)

As for their specific actions on August 17, 2021, Officers Baerber and Bryant were in the Control Room for just two to three minutes after Telford began attacking Proft in Proft's cell. Neither officer saw or heard anything suggesting a fight was taking place during those minutes, nor is there any evidence suggesting that either officer was aware of anything that should have prompted further investigation. It was only once Officers Baerber and Bryant entered the hallway that Officer Bryant thought she heard faint yelling. Officer Baerber still did not hear anything at all, confirming the difficulty of hearing things happening inside housing units from the hallway area. (PFOF 40.)

Regardless, both officers investigated what Officer Bryant heard. Within less than a minute, and at the same time that Proft and Telford came out of Proft's cell, Officer Baerber had called a Code Red. Indeed, Officer Baerber confirmed that she called the Code Red the second that she saw Proft crawling with swollen eyes and before even seeing that Telford was attacking him. (PFOF 99.)

The evidentiary record confirms that once Officers Baerber and Bryant were on notice of a specific risk to Proft, they immediately responded with objective reasonableness by calling a Code Red. Even Plaintiff's expert opined that once staff detected the assault, "they acted within commonly accepted correctional practices and performed their duties." (Dec. of Mills, Ex. I, p. 8.) Accordingly, Officers Baerber and Bryant are entitled to summary judgment on Count I.

### 2. Officers Weddig, Wolfgram, and Huybers

The claim against Officers Weddig, Wolfgram, and Huybers also fails on each element of the objective reasonableness test for the same reasons as the claim against Officers Baerber and Bryant. In the six weeks following Telford's arrival at WCJ on July 4, 2021, Officers Weddig, Wolfgram, and Huybers did not receive any information or make any observations suggesting that Telford may have any violent propensities towards correctional staff or inmates. (PFOF 59-60.) On August 17, 2021, Officer Huybers was working as a rover. This meant that he had a variety of duties, including but not limited to assisting other officers as needed, covering other posts, and sitting in the Control Room when the Adult Pod officers perform their rounds of the pods. (PFOF 77.)

On the date in question, Officers Weddig and Wolfgram were assigned to the Adult Pod Control Room. (PFOF 75.) Officers assigned to the Control Room are responsible for conducting hourly rounds of each housing unit, which involves walking through each of the eleven housing units at least once an hour and visually observing each inmate. (PFOF 20, 76.) However, these officers have multiple responsibilities beyond simply performing walk throughs and observing inmates. For example, among other duties, they are responsible for opening and closing doors within the facility,

monitoring inmate movement, monitoring fellow officers who are working with inmates or in housing units, answering intercom calls, and answering phone calls. (PFOF 31, 36-37.) It is WCJ policy and practice, consistent with Administrative Code § DOC 350.18, that officers' primary form of inmate monitoring is direct visual observation of inmates. (PFOF 17-18.) However, WCJ officers are not expected to maintain constant visual contact with each inmate housed in the Adult Pod. (PFOF 19.)

As part of their duties as Control Room officers, Officers Weddig and Wolfgram performed a walk-through of the Adult Pod D at approximately 12:01 p.m. on August 17, 2021, and saw nothing amiss. (PFOF 63.) Inmates in Adult Pod D were served lunch at 12:11 p.m., and Telford and Proft sat next to each other for lunch without interacting in any noticeable way. (PFOF 64-66.) Telford and Proft also sat next to each other in the dayroom after lunch, again without any apparent interactions. (PFOF 67-71.) At approximately 1:05 p.m., Officers Weddig and Wolfgram performed another walk-through of Adult D Pod and again saw nothing amiss. (PFOF 72.)

By 1:20 p.m., Officers Weddig and Wolfgram had returned to the Control Room after completing their rounds. (PFOF 73, 79.) Officer Wolfgram began eating his lunch. (PFOF 80.) Officer Huybers was in the Control Room at this time because he had covered the area while Weddig and Wolfgram did rounds. (PFOF 78.) Officers Baerber and Bryant joined the trio in the Control Room at 1:20 p.m. and 1:24 p.m., as discussed above, as they prepared to escort inmates from the Adult Pod to court hearings. While none of the officers recall exactly what they were discussing in the Control Room between about 1:20 p.m. and 1:28 p.m., to the best of their recollection, they each confirmed that they believe they were discussing work-related matters. (PFOF 112.)

When Officer Weddig heard Officer Bryant's report of yelling at 1:27 p.m., he visually scanned the housing units in the Adult Pod but did not initially see anything amiss. (PFOF 94.) Within a few seconds, while still in the Control Room, Officer Huybers turned on the Adult D Pod intercom to investigate Officer Bryant's report, at which point he heard noise and then observed two inmates

coming out of Proft's cell who appeared to be involved in an altercation. (PFOF 98.) Almost simultaneously, Officer Baerber called a Code Red. (PFOF 99.)

Upon hearing the Code Red called for Adult D Pod, Officers Weddig and Wolfgram looked into Adult D Pod and saw Telford assaulting Proft on the catwalk. (PFOF 100.) They then immediately ran to the hallway outside of the Control Room to the vestibule shared by B, C, and D Pods. (PFOF 102.) In response to the Code Red, Officer Huybers used the intercom to call into Adult D Pod and ordered all inmates to lock into their cells. (PFOF 101.) Because Telford was not locking into his cell as ordered, Officer Wolfgram yelled through the food pass opening in the pod door at Telford to lock into his cell. (PFOF 103.) Officer Weddig ran and grabbed the Adult Pod medical bag and yelled down the hallway towards the nurse's office that a nurse was needed. (PFOF 106.) Within one minute of the Code Red being called, multiple officers entered Adult D Pod, got Telford to lock into his cell, and rushed to Proft to assist him. (PFOF 107-111.)

Based on this record, Plaintiff's claim against Officers Weddig, Wolfgram, and Huybers fails on the first and second elements, because none of them made any intentional decisions regarding Proft's conditions of confinement, let alone a decision that put Proft at a substantial risk of harm. None of these officers classified Proft or Telford. (PFOF 48, 56.) And, like Officers Baerber and Bryant, even if it is assumed that Officers Weddig, Wolfgram, and Huybers were aware of both the details of those classifications and the information learned during Proft's and Telford's bookings, none of that information would put a reasonable officer on notice of any specific risk of harm to Proft.

As for their specific actions on August 17, 2021, Officers Weddig and Wolfgram performed hourly rounds through Adult D Pod twice in the 90 minutes before the attack and saw nothing out of the ordinary. To the extent that they may have visually observed the inmates in Adult D Pod during or after lunch in the hour before the attack, Officers Weddig and Wolfgram would only have seen Proft and Telford calmly sitting next to each without interacting. Neither Officer Weddig, Officer

Wolfgram, nor Officer Huybers saw or heard anything suggesting that a fight was taking place in Adult D Pod until Officer Bryant alerted them from the hallway at approximately 1:27 or 1:28 p.m. The officers did not ignore Officer Bryant's report and instead began investigating. Within less than a minute of Officer Bryant's report, Officer Baerber called the Code Red right as Officer Huybers observed two inmates coming out of Proft's cell. The fact that officers waited for back-up and did not immediately run into the housing unit does not make their actions unreasonable. *See Pulera v. Sarzant*, 966 F.3d 540, 555-6 (7th Cir. 2020) (objective reasonableness does not "demand that a correctional officer enter a potentially dangerous situation before back-up can arrive"). And as Plaintiff's expert confirmed, the officers' response once they became aware of the incident was entirely reasonable.

Ultimately, Plaintiff faults the defendant officers, Officers Weddig, Wolfgram, and Huybers in particular, for not constantly observing every area of each of the eleven housing units in the Adult Pod and not seeing the fight sooner. Indeed, Plaintiff asserts in the operative complaint that the officers were just "loafing on the job." (Dkt. 40, ¶ 111.) However, the record confirms that to be untrue. All observations required by Wisconsin Administrative Code were conducted in a timely manner. And the fact that the officers in the Control Room between 1:24 p.m. and 1:28 p.m. did not see what was happening in Proft's cell during those four minutes does not mean they were "loafing" or otherwise acted in an objectively unreasonable manner. No matter where an officer is positioned in the Control Room, the officer will be facing one of eleven housing units within the Adult Pod (Pods A – K) while also having his or her back to a housing unit. (PFOF 25-27.) Officers cannot look everywhere at all times and do not have eyes in the backs of their heads, and the Constitution does not require perfection. *See Pulera*, 966 F.3d at 555-6 (citing *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) (explaining that the reasonableness inquiry "necessarily takes into account the sufficiency of the steps that officers did take"). Accordingly, the Court should dismiss Count I as to Officers Weddig, Wolfgram, and Huybers.

**B. Count II – "Deliberate Indifference" to Alleged Difficulties Observing Proft's Cell.**

    **1. Officers Bryant, Baerber, Weddig, Wolfgram, and Huybers**

Plaintiff claims that the Defendant officers "were aware that could [sic] not see and observe all areas of Pod D from a seated position or even on the improper [sic] camera system…" (Dkt. 40, ¶ 103.) Plaintiff continues that the officers did not observe or did not have the ability "to observe the cells while on duty, as demonstrated by photos and video…" (*Id.*, ¶ 105.) Plaintiff's allegations about officers' ability to see into Adult D Pod and Proft's cell are nonsensical at best.

Throughout each officer's deposition, they were shown screenshots from surveillance videos and photographs and video screenshots of various angles in the Control Room taken by Plaintiff's counsel during an inspection of the Jail. (*See, e.g.,* Ex. A at 9:8-10, 17:9-19:10, 20:22-22:21, 23:6-23, 31:6-17, 37:7-21; Ex. B at 11:15-12:3, 14:8-15:11, 21:12-22:16, 23:23-24:21, 32:25-33:7, 38:1-20, 39:5-15, 40:4-41:15; Ex. C at 12:17-20, 21:4-25, 22:11-23:13, 25:12-26:3, 38:13-24, 61:2-62:5; Ex. D at 10:11-11:4, 15:7-16:4, 17:12-19:22, 21:14-22:6, 26:21-27:4, 42:11-23, 48:10-49:3; Ex. E at 19:21-20:9, 31:19-34:7, 47:2-50:21; Ex. H, *passim; see also* Dec. of Mills, Ex. CC.) Often times, the witness was, at best, confused as to what they were being shown and asked to answer. The officers were repeatedly asked whether and/or what a person could see in Adult Pod D from a position or angle depicted in a photograph. The officers uniformly and consistently explained that <u>it just depends</u>. Below are just a few examples:

> Q.    So if all of the male adult pods are solely on one 24-inch monitor and you would on occasions have a chance to sit where Officer Huybers is situated, would you be able to in that position see what is going on in a cell and remain seated, or you would have to get up to go to the monitor and look?
>
> OBJECTION: Objection; foundation, speculation and it would be hypothetical.  You can answer if you're able to.
>
> A.    I would say **it depends** on where the incident –if there was one, hypothetical. These pictures are really hard to – it depends on where it's happening, you know. If it's further in the dayroom, you might have a better view than if it's in a different spot.

…

Q.      Sure. But is it fair to say that you would still have to get up out of your chair to see what's going on on the video?

OBJECTION: Objection; form, foundation, speculation.

A.      I guess **it depends** on what is going on and where it's located.  I – I'm not understanding really what you're asking me, and I thought I answered that already.

(Ex. A at 42:2-418, 43:23-44:6 (emphasis added).)

Q.      Okay.  So I'm trying to figure out what's easier for you when you're in the pod. Is it looking up at the video screen –the monitor, or is it easier just to stand up and look around?

A.      I would say both. You're – I mean, you're talking split seconds.  If you think you see something and you're not sure, of course you're going to get up and do an actual visual of that area, you know; so I would say both.

Q.      Okay.

A.      You're kind of doing two things so close together.  There's – it's not like you're just going to stand there and go, oh, yeah, it looks like he's getting beat up; I'm just going to stand here, you know, that way.  You're going to actually take a look if that's the first thing you looked at. If you're looking on – in the pod, you know, you'd see it differently than if you found it on camera.

(*Id.* at 44:21-45:15.)

Q.      But the holes are blocking and the door blocking the view? I'm trying to understand what you're saying, ma'am.

A.      The door isn't –it's over the bed.  So **depending on the angle** you're looking at, it might be obstructed.

…

Q.      Well, it's also from the bubble looking into B, you don't have weird angles that you're looking at. You can see directly into the various cells from B or from pod – from the bubble into B, correct?

A.      Yes.  There's always going to be, **depending on your vantage point**, what you can see in each individual cell.

(Ex. B at 19:13-18, 20:19-21:1 (emphasis added).)

Q.      So looking at that direction, can you see into D pod, cell No. 1?

OBJECTION: Objection. Foundation. Answer if you can.

A.     **It depends** on – I don't even know how to answer that. So if you're looking this way, you can see into D pod, and cell one is on the upper tier.

(*Id.* at 40:20-41:2 (emphasis added).)

Q.     Okay. What about where Huybers is located? Is it difficult to see one and four?

OBJECTION:  Objection.  Foundation. Asked and answered.

A:     From where he's sitting and where he's looking now or from where?

Q.     No, just generally, if you were – the same prefatory questions that I asked you earlier, if you were –

A.     If he was turned towards the computer?

Q.     Correct.  If he's turned towards that monitor, is one and four still difficult for him, for anyone in that seat, to be able to see?

A.     **It depends** on just the angle, the height of the chair.  Sometimes people have the chairs lower, two, three inches lower, so **it just depends**.

(Ex. E at 47:20-48:11 (emphasis added).)  Officer Wolfgram confirmed that there are things that officers cannot see while seated that they can see if they are standing. (*Id.* at 59:25-60:12.) And as Officer Weddig confirmed, what an officer can or cannot see "totally depends on where you position yourself." (Ex. C at 61:20-21.)

Security measures in the WCJ facility, including steel bars and windows, can create obstacles to an officer's view into Adult Pod housing units depending on the officer's position and angle of vision. (PFOF 28.) Officers in the Control Room may have to move around to see certain views in the Adult Pod housing units depending on the officers' positioning and their desired view. (PFOF 29.) But there are no blind spots when looking into Adult D Pod from the Control Room. (PFOF 29.) Depending on where s/he is standing or positioned and the angle that s/he is looking, an officer in the Control Room can see into cell 1 in Adult D Pod through direct visual observation. (PFOF 30.)

Officers assigned to the Control Room are expected to monitor inmates in the Adult Pod

housing units from both sitting and standing positions. (PFOF 32.) Officers in the Control Room are not immobilized or otherwise unable to move or prevented from moving around the room. (PFOF 39.) The chairs in the Control Room have wheels and can be moved. (PFOF 38.) In addition to their own visual observations, officers assigned to the Control Room also have access to two video monitors extending from the ceiling of the Control Room. (PFOF 33.) One of the two video monitors in the Control Room displays live camera feeds into each of the housing units in the male Adult Pod on a single screen, while the other monitor displays live camera feeds of other parts of WCJ, including things like hallways and the visitation area, on a single screen. (PFOF 34.) Officers are able to pull up and enlarge a single camera feed onto the full screen on the video monitors. (PFOF 35.)

Plaintiff's contention that there is some kind of known inability to observe the cell in which Proft was housed is both rebutted by the record and ignores the obvious: officers can and do move around to ensure they can see things. Depending on the angle and where an officer is sitting, s/he may have difficulty seeing into a particular area of any given housing unit in the Adult Pod. But that does not transform the view into some kind of constant blind spot. As Officer Baerber explained, "If you think you see something and you're not sure, of course you're going to get up and do an actual visual of that area." (Ex. A at 45:1-4.)

Moreover, Plaintiff's position misconstrues what is objectively reasonable in terms of inmate observation. Wisconsin Administrative Code requires a jail to ensure "that all inmates are personally observed by jail security staff at staggered intervals not to exceed … 60 minutes." WI Admin § DOC 350.18(1)(a). A video monitoring system may be used to supplement those observations, but it is not required and cannot replace those personal observations. WI Admin § DOC 350.18(2). It is undisputed that Proft and Telford were observed in accordance with these code provisions, and the officers had no reason to believe that more frequent monitoring was necessary.

Finally, Count II fails due to the lack of evidence of causation. Here, there is no evidence that

officers' ability (or alleged inability) to observe inmates either visually or via the video monitoring system had anything to do with Proft's death. There is no evidence in the record that any officer actually looked at Proft's cell while in the Control Room between 1:24 p.m. and 1:28 p.m. on August 17, 2021, let alone that any officer failed to see the assault because of some difficulty or obstruction when looking at Proft's cell. Similarly, there is no evidence that any officer looked at Adult Pod D on the video monitor in the Control Room between 1:24 p.m. and 1:28 p.m. and failed to see the assault because of some deficiency with the surveillance system. Thus, even if it is assumed that there were serious inadequacies with officers' ability to see into Adult D Pod or Proft's cell in particular, there is no evidence that such inadequacy caused any officer not to see the fight sooner. Therefore, Count II must be dismissed.

### 2. Washington County

Plaintiff also asserts Count II against Washington County. Plaintiff contends that "the County" was aware "of the difficulties of a guard being able to observe cell #1, but did not allocate better resources such as a better camera system or even desk monitors for the guards in the control pod." (Dkt. 40, ¶ 104). Defendants interpret this as being duplicative of Plaintiff's *Monell* claim, addressed in detail below[3]. (*See* Dkt. 40, ¶¶ 111(a), 112, 114.)

## II. ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNTS I AND II.

Even if the Court is unable to conclude that one or more of the individual Defendants did not violate Proft's constitutional rights as a matter of law, summary judgment is nevertheless appropriate through qualified immunity. Based on the undisputed facts, Defendants' conduct did not violate any rights belonging to Proft that were clearly established in a particularized sense on August 17, 2021.

---

[3] To the extent that the claim was intended as a supervisor liability claim, such claims under § 1983 require a showing that the supervisor knew about constitutional violation and was personally involved in it. *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 479 (7th Cir. 2024) (citing *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017)). Even beyond the flaws with the claim's underlying premise, the claim as asserted against the County must be dismissed because of the lack of evidence of any personal involvement by the only supervisor named as a defendant in this case: Sheriff Schulteis.

Qualified immunity is an affirmative defense pursuant to which "government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (internal citations omitted). An official is entitled to immunity if, when he acted, "he reasonably could have determined that his actions did not violate clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal citations omitted). Accordingly, qualified immunity is recognized when public officials "of reasonable competence could disagree" as to whether the complained of acts infringed the plaintiff's rights. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once the affirmative defense of qualified immunity is raised, it is always the plaintiff's burden to defeat it by "establishing [both] that his or her rights were violated and that the law concerning the proffered right 'was clearly established at the time the challenged conduct occurred.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). Importantly, a plaintiff's failure to satisfy his or her burden on "either [prong] is fatal for the plaintiff's case[,]" and the defendant is entitled to qualified immunity if the plaintiff fails to meet his burden on either prong. *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). To meet its burden under the "clearly established" prong, Plaintiff must demonstrate the rights allegedly violated were "clearly established" in one of three ways: (1) "[f]irst, by identifying a 'closely analogous case finding the alleged violation unlawful[;]'" (2) "[s]econd, by identifying in the relevant caselaw 'such a clear trend . . . that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time[;]'" and (3) third, "reserved for 'rare cases,' [by showing the alleged conduct] was 'so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620–21 (7th Cir. 2022).

Additionally, Plaintiff must frame the right(s) in question "'at the appropriate level of

specificity[,]" as "'[t]he Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018). While Plaintiff need not point to a case that is factually identical to the present suit, it must still show that "existing precedent [ ] placed the statutory or constitutional question **beyond debate**" to overcome Appellants' assertion of qualified immunity. *Ashcroft*, 563 U.S. at 741 (emphasis added). Ultimately, "[t]he dispositive question is 'whether the violative nature of **particular** conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12, (2015) (emphasis in original). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft*, 563 U.S. at 741).

Here, at the very least, Defendants Baerber, Bryant, Weddig, Wolfgram, and Huybers are entitled to qualified immunity because, as established above, there was no underlying constitutional deprivation, and a reasonable officer in their positions could have believed that his or her actions were objectively reasonable. The discussion of the *Kemp* and *Thomas* cases, *supra*, shows that no reasonable officer would be on notice of any specific risk of harm to Proft based on the undisputed record. While the *Kemp* and *Thomas* decisions post-date the 2021 incident that is the subject of this lawsuit, they both rely on the standard established by *Kingsley* in 2015. They also both rely on precedent existing in August 2021 confirming that to show objective unreasonableness in a failure to protect case, a plaintiff must show that the officer was on notice of a risk of harm, *Kemp*, 27 F.4th at 495 (citing *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018)); and the risk must be "somehow 'specific to a detainee, and not a mere general risk of violence.'" *Thomas*, 39 F.4th at 842-3 (quoting *Budz*, 398 F.3d at 909).

Even if the Court believes that one or more of the individual Defendants may have violated Proft's Fourteenth Amendment rights, no precedent existing in August 2021 placed that constitutional question "beyond debate." Because any reasonable officer in the position of the individual Defendants

reasonably could have determined that his or her actions did not violate clearly established law, Officers Baerber, Bryant, Weddig, Wolfgram, and Huybers are entitled to qualified immunity.

### III. THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FOURTEENTH AMENDMENT *MONELL* CLAIM.

Municipal liability under § 1983 requires acts or failures to act that are "attributable to the municipality [that] itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of the Cnty. Cmm'rs v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). In this respect, the bar is high: to establish municipal liability under § 1983, a plaintiff must show that an "express policy (e.g., policy statement, regulation, or officially adopted decision), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality" was the direct cause of the alleged constitutional deprivation. *J.K.J v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020) (cleaned up). A plaintiff must demonstrate that the municipality's action "was taken with deliberate indifference" to his or her constitutional rights. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Negligence or even gross negligence on the part of the municipality is not enough. *Id.* Instead, a plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences. *Id.*

To prevail under *Monell*, a plaintiff must show that the municipality had notice at the policymaking level that the policy or practice in question would cause constitutional violations. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021); *J.K.J.*, 960 F.3d at 379 (citing *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011)). Notice to a policymaker can be shown in two different ways. First, a plaintiff can point to "a prior pattern of similar constitutional violations." *J.K.J.* at 380. Second, a plaintiff can show that a municipality is on notice when the likelihood of a constitutional violation is "so patently obvious" or "highly predictable" such that a pattern of violation is not required. *Id.* at 380–81 (citing *Connick*, 563 U.S. at 64).

For purposes of showing a prior pattern of violations through a widespread practice, "[a] practice is not a random event, and isolated acts by individual employees are not sufficient to establish a widespread practice" of unconstitutional conduct as required to state a claim under § 1983. *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303-304 (7th Cir. 2010). A "widespread practice" is one "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." *Thomas*, 604 F.3d at 303 (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)).

Plaintiff asserts a § 1983 municipal-liability claim against both the County and Sheriff Schulties by lodging the proverbial kitchen sink of allegations. (Dkt. 40, pp. 28-29). Plaintiff contends that Washington County policies and practices caused Proft's death, because they resulted in: Telford not being provided a "proper" mental health screening (*id.* at ¶¶ 110, 126); an inadequate video system (*id.* at ¶¶ 111(a), 112, 114); a failure to properly "observe and treat" inmates (*id.*, ¶ 111(b)); a failure to supervise (*id.*, ¶ 111(c)); inadequate training (*id.*, ¶¶ 113, 119-120, 124); and incorrect classification (*id.*, ¶¶ 120, 126). Washington County had robust policies and practices covering each of these topics. (PFOF 7-24, 42-43.) Under any of these theories, Plaintiff's claims against the County fail.

## A. Mental Health Screenings.

First, there is no evidence in the record that Telford was not provided a "proper" mental health screening when he was booked into WCJ. In fact, there is no evidence that Telford suffered from any kind of mental illness or other disability. Even more fatally, Plaintiff's claim fails because of the lack of evidence that Washington County had a policy or custom of failing to provide "proper" mental health screenings. And Plaintiff cannot point to any evidence of a pattern of similar constitutional violations that would have in any way connected mental health screenings with inmate assaults. "[O]n an empty record the plaintiff loses, because the plaintiff has the burdens of production

and persuasion." *Est. of Logan v. City of S. Bend, Indiana*, 50 F.4th 614, 615 (7th Cir. 2022). Therefore, any *Monell* claim based on this theory of liability must be dismissed.

**B.    Inadequate Video System.**

As explained above, WCJ officers' ability to see into cells was not inadequate or insufficient. There will always be areas of housing units that are difficult to see depending on where an officer is sitting or standing and the angle of the officer's view. Further, there is no requirement that jails in Wisconsin have any kind of video surveillance system at all, let alone any Constitutional duty to have a system of any particular adequacy.

Aside from these practical flaws with this theory of *Monell* liability, this claim also fails because there is no evidence of causation. *Monell*'s standards of culpability and causation are rigorously "applied to ensure that the municipality is not held liable solely for the actions of its employee." *J.K.J*, 960 F.3d at 377 (quoting *Brown*, 520 U.S. at 405); *First Midwest Bank*, 988 F.3d at 987. As explained above, there is no evidence that the quality or adequacy of WCJ's video monitoring system had anything to do with Proft's death. There is no evidence in the record that any officer looked at a video monitor in the Control Room during the first four minutes of the assault and failed to see the fight because of some deficiency with the surveillance system. Thus, even assuming that there were serious inadequacies with the video surveillance system – and even if it is assumed that the policymaker, Sheriff Schulteis, was aware of these inadequacies and consciously chose to disregard them – the lack of evidence of causation requires dismissal of this claim.

**C.    Failure to Properly Observe and Treat Inmates.**

On this theory, Plaintiff dumps more into the kitchen sink: the allegation of failing to "properly observe and treat inmates" includes "inadequate intake, screening, evaluation, diagnosis, referral to mental health professionals, treatment plans, administration of medications, medical record keeping, staffing, communication between medical, mental health and custodial staff, housing, supervision, and

access to mental and medical health care." (Dkt. 40, ¶ 111.) Despite the broad strokes with which this theory is plead, it fails on the undisputed record.

First, there is no evidence of any pattern of prior, similar incidents involving any of the above-mentioned topics that would have put the County on notice of the likelihood of a constitutional violation. The claim ends there. But even in Telford's and Proft's specific cases, there is no evidence of any inadequacy in any of the listed policies, practices, and procedures. Nothing in the record suggests that WCJ's intake screenings of Telford and/or Proft were inadequate. There is no evidence of any inadequate evaluation, diagnosis, or referral to mental health professionals, nor is there any evidence that either Telford or Proft suffered from any condition that was not being adequately treated. Indeed, neither man identified any medical conditions or concerns of any kind at booking. (PFOF 46, 54.) Further, correctional staff at WCJ are not trained medical professionals and do not provide inmates with medical treatment, so they would have no personal involvement in any medical or mental health diagnoses, treatment plans, medication decisions, medical record keeping, or medical staffing anyway. (PFOF 114.) And there is no evidence that there was ever any need for correctional staff to communicate with medical staff about Telford or Proft prior to the assault, so there is no evidence of any inadequacy in communication or coordination. This is all in addition to the wholesale lack of proof on causation. Again, on an empty record, Plaintiff loses. *Est. of Logan*, 50 F.4th at 615.

## D. Failure to Supervise.

Failure to supervise claims are "a tenuous form of *Monell* liability" that are "available only in 'limited circumstances'" and "subject to rigorous fault and causation requirements." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019) (internal citations omitted). Evidence of a pattern of similar violations is necessary to establish the requisite element of notice in order to find liability under this theory. *Id.* at 599-600. Here, the lack of evidence of notice and causation is particularly stark. Telford's assault caused Proft's death, and nothing in the record suggests that the County had notice

that more supervision of correctional staff was necessary to prevent such attacks. Therefore, this theory of liability fails.

**E.   Inadequate Training.**

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 ("[A] policy of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). Thus, a municipality may be liable for its alleged "failure to train" its officers through evidence of "a known pattern of tortious conduct demonstrating the need for additional training, rather than a one-time negligen[ce]." *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (internal citations omitted). Evidence of a pattern is required to show that the municipality "has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm..." *Id.* at 733. And of course, even when inadequate training is established, that inadequate training must cause the injury in question. *Tapia v. City of Greenwood*, 965 F.2d 336, 338-9 (7th Cir. 1992).

In addition to Plaintiff's total lack of evidence of any training deficiency, where a municipality requires its officers to meet the minimum standards of training under state law, there is no deliberate indifference to training needs. *Schnese v. County of Forest*, No. 19-C-1385, 2021 WL 3711035, at *13 (E.D. Wis. 2021) (citing *Tapia*, 965 F.2d at 339 and *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 931 (E.D. Wis. 1999)). This is exactly what WCJ policy requires. (PFOF 113.) Regardless of whether the municipality provided additional or different training above and beyond the state requirements, "compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference." *Johnson*, 41 F.Supp.2d at 931.

In Wisconsin, training of jail officers is governed by state law. The Wisconsin legislature established the Law Enforcement Standards Board to prescribe minimum requirements for jail officer

training. *See* Wis. Stat. § 165.85(4)(b). The Board has issued regulations governing jail officer training standards in such areas as maintaining security, supervising inmates, and assisting in healthcare programs. *See* WI Admin § LES 3.04. Each of the individual Defendants met these standards and requirements of training for corrections officers as of August 17, 2021. (PFOF 6.) Thus, Plaintiff's *Monell* claim fails on this theory as well.

## F. Improper Classification.

Finally, Plaintiff takes issue with the fact that both Proft and Telford were classified as medium security inmates and asserts that the policy and practice of classification at WCJ was deliberately indifferent to inmates' safety and welfare. This theory of liability fails both legally and factually.

Washington County has extensive policies and procedures in place pertaining to the classification of all inmates housed at WCJ. (PFOF 9.) Upon the initial intake at WCJ, incoming inmates are not assigned to general population and instead are housed in a single-cell setting until their first court appearance. (PFOF 10.) At this stage, incoming inmates go through an "initial classification" during which acute issues, such as the inmate's medical issues and risk factors, are reviewed. (PFOF 11.) Once an inmate has an initial court appearance, WCJ classification staff conducts a "primary classification" that results in a decision about the inmate's security status (maximum, medium, or minimum), his/her assignment to general population, his/her style of housing unit, and his/her programming. (PFOF 12.) Inmates like Proft who are arrested for felony probation holds do not have an initial court appearance and therefore WCJ performs the initial and primary classifications of those inmates simultaneously. (PFOF 13.)

During primary classification, a classification officer goes through a series of questions that follows a classification tree model and assigns points for certain answers, with the total points dictating whether the inmate is assigned as maximum, medium, or minimum security status. (PFOF 14.) The lowest possible security status rank assigned during primary classification for an inmate who is arrested

on a felony probation hold – like Proft – is medium due to the existence of a prior felony conviction. (PFOF 15.) The classification status of WCJ inmates classified as minimum and medium security is reviewed every 30 days and may change depending on various factors. (PFOF 16.)

In its operative complaint, Plaintiff characterizes Telford as a violent individual based on his charges, and it juxtaposes that alarming characterization with its more favorable description of Proft. (*See* Dkt. 40, ¶¶ 19-24.) Plaintiff asserts that Proft was merely incarcerated due to an arrest for allegedly operating while intoxicated and a probation hold, so he should never have been housed in the same unit as someone like Telford. But Plaintiff omits the fact that Proft was incarcerated on a felony probation hold from a past felony conviction for a violent crime: armed robbery. (Dkt. 40, ¶ 19; PFOF 115.) This resulted in Proft's classification of medium security. Telford's situation was essentially the inverse of Proft's: he did not have any prior felony convictions on his record at the time of his classification, but he was incarcerated on charges that included two violent offenses. (PFOF 116-117.) Accordingly, he was also properly classified as medium security. Nothing about this process suggests any policy or practice of misclassifying inmates, nor can Plaintiff point to any evidence of a pattern of similar incidents that would have provided the County with the notice necessary for Plaintiff to proceed under this theory of liability.

But Plaintiff's *Monell* theory hinging on classification also fails legally. At the outset, the Seventh Circuit has held that "classification of inmates, whether or not desirable, is not a constitutional requirement." *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir. 1988). Moreover, "[t]he safety and security of the jail and its staff are critically important and federal courts will not second guess their security decisions," even under the Fourteenth Amendment, unless those decisions "manifest[] an intent to punish or unless their actions amount to a deprivation of life's necessities." *Bernard v. Scott*, 501 F.Supp.3d 611, 626 (N.D. Ill. 2020) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The Supreme Court determined more than forty years ago that "[p]rison administrators therefore should be

accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). Nothing in the record suggests that WCJ's classification decisions in Proft's and Telford's cases specifically – or their classification processes more generally – were based on anything other than the need to maintain institutional security and preserve internal order and discipline. Therefore, this claim should also be dismissed.

## IV.     DEFENDANTS ARE ENTITLED TO DISCRETIONARY IMMUNITY FOR EACH OF PLAINTIFF'S STATE LAW CLAIMS.

Count IV (failure to train and supervise), Count V (wrongful death), Count VI (violation of Wis. Stat. § 101.11) and Count VII (negligence) are each easily disposed of at the summary judgment stage under the doctrine of discretionary immunity. *See* Wis. Stat. § 893.80(4). Under Wisconsin law, no suit may be brought against a municipality or its officers or employees for discretionary acts, even if those discretionary acts are performed negligently. *See Brown v. Acuity*, 2013 WI 60, ¶ 43, 348 Wis.2d 603, 833 N.W.2d 96; Wis. Stat. § 893.80(4). Both public officers or employees and the governmental entities that employ them "enjoy immunity from liability for injuries resulting from the performance of any discretionary act within the scope of their governmental employment." *Wilson v. City of Milwaukee*, 138 F.Supp.2d 1126, 1130 (E.D. Wis. 2001) (quoting *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis.2d 81, 88, 596 N.W.2d 417 (1999)); *see also* Wis. Stat. § 893.80(4). The discretionary immunity analysis **assumes** negligence and "focus[es] instead on whether the municipal action (or inaction) upon which liability is premised is entitled to immunity under the statute, and if so, whether one of the judicially-created exceptions to immunity applies." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 17, 253 Wis. 2d 323.

A discretionary act involves the "exercise of judgment in the application of a rule to specific facts." *Willow Creek Ranch, LLC v. Town of Shelby*, 2000 WI 56, ¶ 25, 235 Wis.2d 409. Immunity does not attach to ministerial duties, which are "absolute, certain and imperative, involving merely the

performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Board of Regents*, 72 Wis.2d 282, 301, 240 N.W.2d 610 (1976).

Count IV fails at the outset, because decisions about supervision and training of jail staff are purely discretionary. *See Sheridan v. City of Janesville*, 164 Wis.2d 420, 430, 474 N.W.2d 799 (Ct. App. 1991); *see also Yao v. Chapman*, 2005 WI App 200, ¶¶ 32-35, 287 Wis.2d 445, 705 N.W.2d 272; *Neitzel v. City of Crandon*, 2011 WI App 155, ¶¶ 9-11, 337 Wis.2d 735, 807 N.W.2d 32 (unpub.); *Liebenstein v. Crowe*, 826 F.Supp. 1174, 1187–88 (E.D.Wis.1992); *Noeldner v. Taylor County*, 629 F.Supp.3d 874, fn. 4 (W.D. Wis. 2022). And in any event, the Defendant officers each met the standards and requirements of training for correctional officers established by the Law Enforcement Standards Board of the State of Wisconsin.

As to Counts V and VII, each of the Defendants' actions with respect to Proft was discretionary in nature. Their decisions about where to sit or stand in the Control Room, where to look into the housing units, whether to look at the video monitors, and on how to prioritize various tasks and responsibilities all presented specific sets of facts to which each officer exercised his or her judgment in deciding how to proceed. Moreover, even if it is assumed for the sake of this motion that Wisconsin Administrative Code § DOC 350.18 creates a ministerial duty, the claim fails. That code provision requires jails to visually observe inmates at least once an hour. The record confirms that this requirement was fulfilled on August 17, 2021, and no other statute or rule "prescribes and defines the time, mode and occasion" for the performance of any other correctional duties that Plaintiff contends were not met.

Additionally, although none of the named Defendants had anything to do with Proft's or Telford's classification or housing assignments, even those decisions would be entirely discretionary.

At most, the law merely requires jails to establish a classification system that is "based on objective criteria,"

> …including a prisoner's criminal offense record and gender, information relating to the current offense for which the prisoner is in jail, the prisoner's history of behavior in jail, the prisoner's medical and mental health condition, and any other factor the sheriff, jailer, or keeper of a jail considers necessary to provide for the protection of prisoners, staff, and the general public.

*See* Wis. Stat. § 302.36; *see also* WI Admin § DOC 350.21. No law prescribes with any specificity what weight any of those objective criteria must be given, nor does any law require any particular outcome or classification of any inmate. Such decisions are inherently discretionary, so any claim based on those decisions also fails.

Additionally, it is anticipated that Plaintiff may attempt to circumvent immunity by arguing that the "known danger" exception to discretionary immunity applies. However, the facts of this case demonstrate that this exception to immunity is plainly inapplicable. This exception is only triggered where there exists a "known present danger of such force that the time, mode and occasion for performance is evident with such certainty that nothing remains for the exercise of judgement and discretion." *See Baumgardt v. Wausau Sch. Dist. Bd. of Educ.*, 475 F.Supp.2d 800, 809-810 (W.D. Wis. 2007). "For the known danger exception to apply, the danger must be compelling enough that a self-evident, particularized, and non-discretionary municipal action is required." *Lodl*, 2002 WI 71, ¶ 40, 253 Wis.2d 323. For example, the *Baumgardt* Court held that a ministerial duty exists to report a teacher who is sexually assaulting a student, because under Wis. Stat. § 48.981(3), "once a school administrator is aware of abuse, all discretion is stripped away: a school administrator 'shall' report abuse of which he is aware to authorities." *Baumgardt*, 475 F.Supp.2d at 811-812.

Here, the second that officers knew of a "present danger," they responded by calling a Code Red and running to Adult D Pod. Moreover, the Wisconsin Supreme Court has further narrowed this exception to immunity by explaining that when a governmental actor becomes aware of a known and

compelling danger, the loss of immunity only occurs where the actor "does nothing and allows the danger to continue." *Pinter v. Village of Stetsonville*, 2019 WI 74, ¶ 51, fn. 11, 387 Wis.2d 475, 929 N.W.2d 547 (citing *Heuser ex rel. Jacobs v. Cmty. Ins. Corp.*, 2009 WI App 151, ¶ 34, 321 Wis. 2d 729, 774 N.W.2d 653). But Plaintiff cannot, in good faith, assert that Defendants simply did nothing at once they became aware of the assault. Furthermore, the fact that Defendants' actions did not prevent the assault does not save the claims. *See Heuser ex rel. Jacobs v. Cmty. Ins. Corp.*, 2009 WI App 151, ¶ 33, 321 Wis.2d 729 (explaining that officer will enjoy immunity even if the particular measures he enacted were insufficient to prevent harm).

Finally, any claim under Wisconsin's Safe Place statute fails, because Wisconsin courts have directly addressed this issue: it is well established that the statute's requirements, even when applied to correctional facilities, are discretionary and not ministerial. *See Spencer v. County of Brown*, 215 Wis.2d 641, 649-652 (Ct. App. 1997) (abrogated on other grounds, *Blum v. 1st Auto & Cas. Ins. Co.*, 2010 WI 78, 786 N.W.2d 78); *see also Nusse v. Western Technical College*, 2022 WI App 52, 2022 WL 3452298 (unpub.). This conclusion is inherent in the very language of the statute, which requires employers to adopt "methods and processes **reasonably adequate** to render such … places of employment safe," and requires them to "do every other thing **reasonably necessary** to protect the life, health, safety, and welfare of such employes and frequenters…" Wis. Stat. § 101.11 (emphasis added). Nothing in the statute prescribes and defines the time, mode and occasion for the performance of those duties with any certainty, let alone with "such certainty that nothing remains for judgment or discretion." Consequently, this claim must also be dismissed due to discretionary immunity.

## CONCLUSION

Based upon the foregoing arguments and authorities, Defendants respectfully request that this Court grant their Motion for Summary Judgment and dismiss Plaintiffs' claims on their merits, in their entirety, and with prejudice, together with the costs, fees, and disbursements of this action.

Dated this 30th day of January, 2026.

By: s/ Sara C. Mills
    SAMUEL C. HALL, JR.
    State Bar No. 1045476
    SARA C. MILLS
    State Bar No. 1029470
    ZACHARY J. FLOOD
    State Bar No. 1099136
    CRIVELLO, NICHOLAS & HALL, S.C.
    Attorneys for Defendants Washington County, Martin Schulteis, Tim Huybers, Sean Wolfgram, Brian Weddig, Andrea Bryant and Gloria Baerber
    710 N. Plankinton Avenue, Suite 500
    Milwaukee, WI 53203
    Ph: (414) 271-7722
    Fax: (414) 271-4438
    E-mail:  shall@crivellolaw.com
            smills@crivellolaw.com
            zflood@crivellolaw.com