# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF JALEN PROFT,
by Mary Jane Proft as Special Administrator,

      Plaintiff,

                             Case No:  24-CV-982

v.

WASHINGTON COUNTY, MARTIN SCHULTEIS,
BRIAN WEDDIG, SEAN WOLFGRAM, ANDREA
BRYANT, GLORIA BAERBER, TIM HUYBERS, JOHN
DOES 1-10 and ABC INSURANCE COMPANY

      Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF MATERIAL FACT
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Washington County (the "County"), Martin Schulteis, Brian Weddig, Sean Wolfgram, Andrea Bryant, Gloria Baerber, and Tim Huybers, by their attorneys, Crivello, Nichols & Hall, S.C., respectfully submit the following Proposed Findings of Material Fact in support of their Motion for Summary Judgment (hereafter referred to as "DPFOF")[1].

## INTRODUCTION

1.     In August 2021, Officer Brian Weddig had been employed as a corrections officer at the Washington County Jail ("WCJ") since 2000. (Dec. of Mills, Ex. C at 5:8-15.)

2.     In August 2021, Officer Sean Wolfgram had been employed as a corrections officer at WCJ since 1998. (Dec. of Mills, Ex. E at 7:19-25.)

3.     In August 2021, Officer Andrea Bryant had been employed as a corrections officer at WCJ

---

[1] Unless otherwise stated, all proposed facts refer to events or conditions in August 2021.

since 2000. (Dec. of Mills, Ex. B at 5:15-25.)

4. In August 2021, Officer Gloria Baerber had been employed as a corrections officer at WCJ since 1990. (Dec. of Mills, Ex. A at 10:8-16.)

5. In August 2021, Officer Timothy Huybers had been employed as a corrections officer at WCJ since 2000. (Dec. of Mills, Ex. D at 5:16-6:3.)

6. As of August 17, 2021, Brian Weddig, Sean Wolfgram, Andrea Bryant, Gloria Baerber, and Timothy Huyber each met the standards and requirements of training for correctional officers established by the Law Enforcement Standards Board of the State of Wisconsin. (Dec. of Lehman, ¶ 15.)

7. Washington County had policies and procedures in place pertaining to the rules of conduct, correctional officer duties, and work rules applicable to correctional staff working at WCJ. (Dec. of Lehman, ¶ 6, Ex. J.)

8. Washington County had policies and procedures in place pertaining to training for correctional officers working at WCJ. (Dec. of Lehman, ¶ 7, Ex. K.)

9. Washington County had policies and procedures in place pertaining to the classification of all inmates housed at WCJ. (Dec. of Lehman, ¶ 8, Ex. L.)

10. Upon the initial intake at WCJ, incoming inmates are not assigned to general population and instead are housed in a single-cell setting until their first court appearance. (Dec. of Mills, Ex. H at 198:19-199:14.)

11. Upon initial intake at WCJ, incoming inmates go through an initial classification during which acute issues, such as the inmate's medical issues and risk factors, are reviewed. (Ex. H at 198:19-199:14.)

12. Once an inmate has an initial court appearance, WCJ classification staff conducts a primary classification that results in a decision about the inmate's security status (maximum, medium, or

minimum), his/her assignment to general population, his/her style of housing unit, and his/her programming. (Ex. H at 198:19-199:14, 200:1-10.)

13.     Inmates arrested for felony probation holds do not have an initial court appearance and therefore WCJ performs the initial and primary classifications of those inmates simultaneously. (Ex. H at 211:2-22.)

14.     During primary classification, a classification officer goes through a series of questions that follows a classification tree model and assigns points for certain answers, with the total points dictating whether the inmate is assigned as maximum, medium, or minimum security status. (Ex. H at 200:18-201:13, 203:16-204:11; 208:24-210:13.)

15.     The lowest possible security status rank assigned during primary classification for an inmate who is arrested on a felony probation hold is medium due to the existence of a prior felony conviction. (Ex. H at 213:12-18.)

16.     The classification status of WCJ inmates classified as minimum and medium security is reviewed every 30 days and may change depending on various factors. (Ex. H at 214:10-215:12, 233:19-234:7.)

17.     Washington County had policies and procedures in place pertaining to inmate safety checks and observation of inmates housed at WCJ. (Dec. of Lehman, ¶¶ 9-10, Exs. M-N; Ex. H at 36:20-40:3.)

18.     It is WCJ policy and practice that officers' primary form of inmate monitoring is direct visual observation of inmates. (Ex. H at 34:11-20, 35:21-36:8.)

19.     WCJ officers are not expected to maintain constant visual contact with each inmate housed in the Adult Pod. (Ex. H at 47:11-18; 48:10-22.)

20.     For inmates housed in general population, WCJ officers check on each inmate's welfare by walking through each housing unit at least once an hour and visually observing each inmate. (Ex. H

at 37:2-21; Ex. M.)

21.     Washington County had policies and procedures in place pertaining to receiving screenings of all inmates arriving at WCJ. (Dec. of Lehman, ¶ 11, Ex. O.)

22.     Washington County had policies and procedures in place pertaining to health assessments, mental health evaluations and screening, and mental health services applicable to all inmates housed at WCJ. (Dec. of Lehman, ¶ 12, Ex. P.)

23.     Washington County had policies and procedures in place applicable in the event of an inmate death at WCJ. (Dec. of Lehman, ¶ 13, Ex. Q.)

24.     During the booking process, all WCJ inmates re provided a copy of the jail rules and regulations that prohibit inmates from engaging in battery, fighting, horseplay, and even prohibit inmates from having any physical contact with anyone else. (Dec. of Lehman, ¶ 14, Ex. R.)

25.     The inmate housing area of the male Adult Pod at WCJ consists of eleven housing units (Pod A – Pod K[2]) and two isolation cells. (Ex. H at 19:9-14.)

26.     The eleven housing units within the Adult Pod at WCJ encircle a hallway separating the units from the Control Room[3], where at least one officer is stationed at all times. (Ex. H at 35:21-36:8.)

27.     No matter where an officer is positioned in the Control Room, the officer will be facing a housing unit within the Adult Pod while also having his or her back to a housing unit within the Adult Pod. (Ex. H at 50:22-51:15.)

28.     Security measures in the WCJ facility, including steel bars and windows, can create obstacles to an officer's view into Adult Pod housing units depending on the officer's position and angle of vision. (Ex. H at 245:11-25.)

---

[2] For the sake of clarity, WCJ records often refer to these pods as AA, AB, AC, etc., with the first "A" being a reference to "adult" and the second letter referring to the assigned housing unit.

[3] In depositions and reports, this area was sometimes also referred to as "pod control" or "the bubble." These terms all refer to the Control Room in the Adult Pod shown in the screenshot accompanying Proposed Fact No. 38.

29.     There are no blind spots when looking into Adult D Pod from the Control Room, though officers in the Control Room may have to move around to see certain views in the Adult Pod housing units depending on the officers' positioning and their desired view. (Ex. H at 245:11-25.)

30.     Depending on where s/he is standing or positioned and the angle that s/he is looking, an officer in the Control Room can see into cell 1 in Adult D Pod through direct visual observation. (Ex. H at 153:14-21, 154:14-21; Dec. of Lehman, ¶ 18.)

31.     Officers in the Control Room are responsible for opening and closing doors within the facility, monitoring inmate movement, monitoring fellow officers who are working with inmates or in housing units, answering intercom calls, and answering phone calls, among other things. (Ex. H at 38:17-39:3.)

32.     Officers assigned to the Control Room are expected to monitor inmates in the Adult Pod housing units from both sitting and standing positions. (Ex. H at 35:21-36:8, 36:20-37:7.)

33.     In addition to their own visual observations, officers assigned to the Control Room also have access to two video monitors extending from the ceiling of the Control Room. (Ex. H at 34:11-20, 35:16-36:8; Ex. B at 50:1-7; Ex. D at 21:20-22:2, 23:7-11; Ex. E at 35:2-9.)

34.     One of the two video monitors in the Control Room displays live camera feeds into each of the housing units in the male Adult Pod on a single screen, while the other monitor displays live camera feeds of other parts of WCJ, including things like hallways and the visitation area, on a single screen. (Ex. A at 41:15-42:1; Ex. C at 23:22-24:8; Ex. D at 21:7-13; Ex. H at 151:15-23.)

35.     Officers are able to pull up and enlarge a single camera feed onto the full screen on the video monitors. (Ex. D at 21:20-22:23; Ex. E at 36:14-16.)

36.     There is a single touchscreen monitor system in the Control Room from which officers can open and close secure doors in the Adult Pod. (Ex. H at 78:18-21; Dec. of Lehman, ¶ 16.)

37.     There are two computer stations in the Control Room that officers use for WCJ inmate record management. (Ex. H at 85:19-24; Dec. of Lehman, ¶ 16.)

38. The chairs in the Control Room have wheels and can be moved. (Ex. E at 106:4-5; Dec. of Lehman, ¶ 16.)

39. Officers stationed in the Control Room are not immobilized or otherwise unable to move or prevented from moving around the Control Room. (Ex. H at 245:11-25; Dec. of Lehman, ¶ 16.)

40. Officers stationed in the Control Room have limited ability to hear what is happening in housing units because they are separated from the housing units by multiple panes of corrections-grade security glass and corrections-grade metal security doors that dampen and muffle sounds, with officers' ability to hear things happening in housing units being dependent on the volume of the incident or occurrence. (Ex. H at 143:21-145:5; Dec. of Lehman, ¶ 21; Dec. of Baerber, ¶ 6; Dec. of Bryant, ¶ 6; Dec. of Weddig, ¶ 7; Dec. of Wolfgram, ¶ 7; Dec. of Huybers, ¶ 6.)

41. The Adult D Pod at WCJ has an upper tier and a lower tier with six cells. (Ex. H at 35:21-36:1; Dec. of Lehman, ¶ 17.)

42. It is WCJ policy and practice that when a Code Red is called, the sergeant and all available officers must respond to the area of the call regardless of their assigned location or their seniority. (Ex. H at 93:19 - 94:15; 94:24-95:2.)

43. It is WCJ policy and practice that in an emergency situation in a housing unit, officers do not enter the unit until it is secure and safe to enter. (Ex. H at 97:18-22.)

## JALEN PROFT BOOKING AND CLASSIFICATION

44. Jalen Proft was booked into WCJ on August 15, 2021, for a felony probation hold. (Dec. of Lehman, Ex. S; Ex. H at 211:4-5.)

45. Officer Baerber completed Proft's booking, during which time she completed a medical and mental health screening of Proft. (Dec. of Lehman, Ex. T.)

46. During the completion of Proft's medical screening, Proft did not identify any health conditions or concerns, and he did not display any behavior that suggested he posed a risk of assault

to staff or others. (Ex. T, p. 1-2.)

47.     During the completion of Proft's mental health screening, Proft did not display any notable behavior, did not talk of threats of harm toward others, was not acting aggressively, and his mood appeared normal for the situation. (Ex. T, p. 3-4.)

48.     Officer John Peterson conducted Proft's primary classification, at which time he confirmed that there were no known past or present serious behavior issues involving Proft while incarcerated, Proft had no known gang affiliation, and Proft had a known enemy by the name of Zach Hottenstein. (Ex. S, p. 2; Ex. H at 264:3-8)

49.     No one named Zach Hottenstein was incarcerated at WCJ in August 2021. (Dec. of Lehman, ¶ 19.)

50.     At his primary classification, Proft was classified as medium security due to a felony criminal conviction for a violent crime, armed robbery. (Ex. H at 209:8-210:13, 211:18-22; Ex. S, p. 2.)

51.     Proft was housed in Cell 1 on the upper tier of Adult D Pod, which is at the top left corner of the housing unit. (Dec. of Lehman, ¶ 17.)

## GEORGE TELFORD BOOKING AND CLASSIFICATION

52.     Inmate George Telford was booked into WCJ on July 4, 2021. (Dec. of Lehman, Ex. U.)

53.     Officer Baerber completed Telford's booking on July 4, 2021, during which time she completed a medical and mental health screening of Telford. (Dec. of Lehman, Ex. V.)

54.     During the completion of Telford's medical screening, Telford did not identify any health conditions or concerns, and he did not display any behavior that suggested he posed a risk of assault to staff or others, and he did not display any behavior that suggested he posed a risk of assault to staff or others. (Ex. V, p. 1-2.)

55.     During the completion of the mental health screening, Telford did not display any notable behavior, did not talk of threats of harm toward others, was not acting aggressively, and his mood

appeared normal for the situation. (Ex. V, p. 3-4.)

56.     Officer Chandler Lehrer conducted Telford's primary classification, at which time he confirmed that there were no known past or present serious behavior issues involving Telford while incarcerated, Telford had no known gang affiliation, and Telford had no known enemies. (Ex. U; Ex. H at 264:3-11)

57.     At his primary classification, Telford was classified as medium security due to being charged with a violent offense, and he was assigned to Adult D Pod. (Ex. H at 209:19-210:13.)

58.     Telford's classification was reviewed after 30 days and he remained classified as medium security. (Ex. H at 233:11-18; Dec. of Lehman, ¶ 20.)

59.     In the approximately six weeks between July 4, 2021, and August 17, 2021, Officer Weddig, Officer Wolfgram, Officer Bryant, Officer Baerber, and Officer Huybers had not observed Telford display any behavior or make any statements that would suggest he may have any violent propensities towards correctional staff or other inmates. (Dec. of Baerber, ¶ 4; Dec. of Bryant, ¶ 4; Dec. of Weddig, ¶ 4; Dec. of Wolfgram, ¶ 4; Dec. of Huybers, ¶ 4.)

60.     In the approximately six weeks between July 4, 2021, and August 17, 2021, no one provided Officer Weddig, Officer Wolfgram, Officer Bryant, Officer Baerber, or Officer Huybers with any information that would suggest Telford may have any violent propensities towards correctional staff or other inmates. (Dec. of Baerber, ¶ 4; Dec. of Bryant, ¶ 4; Dec. of Weddig, ¶ 4; Dec. of Wolfgram, ¶ 4; Dec. of Huybers, ¶ 4.)

61.     In the approximately six weeks between July 4, 2021, and August 17, 2021, the only incidents involving Telford were his receipt of a verbal warning for sleeping on his mattress under his bunk on July 7, 2021; one day of cell confinement because Telford had to be asked to stand three times for headcount on July 17, 2021; and a verbal warning on July 25, 2021, because Telford had to be told to put his uniform on because he was standing at his cell door in his boxer shorts. (Dec. of Lehman, Ex.

BB.)

62.     Sheriff Martin Schulteis was not aware of Proft's or Telford's incarcerations at WCJ in 2021

until after the incident on August 17, 2021. (Dec. of Schulteis, ¶ 3.)

## TELFORD ASSAULT OF PROFT ON AUGUST 17, 2021

63.     At approximately 12:01 p.m. on August 17, 2021, Officers Wolfgram and Weddig performed

a routine walk-through of Adult D Pod and did not observe anything amiss. (Dec. of Mills, Ex. F

at 12:01:30 – 12:01:51[4]; Dec. of Weddig, ¶ 5; Dec. of Wolfgram, ¶ 5.)

64.     At approximately 12:11 p.m., officers served lunch to the inmates in Adult D Pod. (Ex. F at

12:11:00 – 12:12:00.)

65.     The seven inmates in Adult D Pod sat at two four-person tables to eat their lunches, and

Telford and Proft sat next to each other.



(All screenshots are provided for illustrative purposes only; *see* Ex. F at 12:11:54. The person circled
in yellow is Telford; the person circled in blue is Proft. *See* Dec. of Lehman, ¶ 4.)

---

[4] Defendants are citing to surveillance video that is being produced in its native format. When playing the video in its
native format, the time stamp remains displayed. In the interest of clarity, citations to times in Exhibits F and G are
citations to the time stamp in the videos where the supporting evidence is found. However, it was confirmed that the time
stamps in the videos are approximately 20 seconds behind "real time," meaning that a time stamp of 2:15:00 p.m. is actually
showing events that occurred at 2:15:20 p.m. (Dec. of Lehman, ¶ 5.)

66.     During lunch, Proft and Telford did not engage in any noticeable interaction as they sat next to each other and may not have even spoken to one another. (Ex. F at 12:12:00 – 12:19:40.)

67.     After returning their lunch trays, Proft and Telford moved throughout the dayroom, appeared to watch TV, and eventually ended up sitting together at the same table again in the dayroom without any apparent interactions with each other. (Ex. F at 12:19:40 – 12:25:53.)

68.     At approximately 12:26 p.m., Proft left the table to use the dayroom telephone, which is located under the stairs between the first and second tiers. (Ex. F at 12:25:54 – 12:40:40; Dec. of Lehman, ¶ 17.)

69.     About one minute later, Telford left the dayroom table and returned to his cell on the second tier. (Ex. F at 12:26:47 - 12:27:10.)

70.     At approximately 12:40 p.m., Proft concluded his phone call, returned to his cell on the second tier, and laid on his bunk. (Ex. F at 12:40:40 – 12:41:25.)

71.     As Proft returned to his cell, he walked past Telford on the upper tier catwalk, but they did not appear to interact or speak to each other. (Ex. F at 12:40:59 – 12:41:06.)



(*See* Ex. F at 12:41:04. The person circled in yellow is Telford; the person circled in blue is Proft.)

72.     At approximately 1:05 p.m., Officers Weddig and Wolfgram entered Adult D Pod to perform another routine walk-through and saw nothing amiss. (Ex. F at 1:05:10 – 1:05:35; Ex. C at 12:21 –

13:3, 15:3-5; Ex. E at 16:22-17:5; Dec. of Weddig, ¶ 5; Dec. of Wolfgram, ¶ 5.)

73.    At approximately 1:20 p.m., Officers Wolfgram, Bryant, Weddig, and Huybers were in the Control Room of WCJ's Adult Pod. (Dec. of Mills, Ex. G at 1:19:59 – 1:20:10.)



(Ex. G at 1:20:01. The person circled in green is Officer Wolfgram; the person circled in orange is Officer Bryant; the person circled in red is Officer Weddig; and the person circled in purple is Officer Huybers.)

74.    On the afternoon of August 17, 2021, Officer Bryant was working as a court rover, which meant that, among other things, she was responsible for escorting WCJ inmates back and forth to court within the jail and for taking inmates to video court. (Ex. B at 8:22-9:12; 10:18 – 11:4; Ex. H at 22:14-24.)

75.    On the afternoon of August 17, 2021, Officers Weddig and Wolfgram were assigned to the Control Room of the Adult Pod at WCJ, which meant that they were responsible for various tasks in each of the adult pods including, but not limited to, observing all inmates in the Adult Pod from the Control Room, serving meals, handing out cleaning supplies to inmates, passing out inmate mail, and working with other officers. (Ex. C at 7:22-8:24; Ex. E at 12:16-21.)

76.    Because of their assignment to the Adult Pod, Officers Weddig and Wolfgram were also responsible for performing walkthroughs, or rounds, of each pod every hour. (Ex. C at 12:10-16.)

77.    On the afternoon of August 17, 2021, Officer Huybers was working as a rover, which meant that he had many duties, including but not limited to assisting other officers as needed, covering other posts, and sitting in the Control Room when the Adult Pod officers perform their rounds of the pods. (Ex. D at 9:18-10:10; Ex. H at 21:19 – 22:4, 146:4-24.)

78.    While Officers Weddig and Wolfgram performed their walkthroughs of the Adult Pod just after 1:00 p.m., Officer Huybers came to the Control Room so that someone would be present to unlock doors and respond to any calls or alarms. (Ex. C at 15:3-12.)

79.    Four officers were in the Control Room at about 1:20 p.m. because Officers Weddig and Wolfgram had recently finished their walkthroughs, Officer Huybers had covered the Control Room in their absence, and Officer Bryant was preparing to escort an inmate from the Adult Pod to a court appearance. (Ex. A at 45:24 – 47:3; Ex. C at 12:21-13:6; Ex. D at 24:17-25:14; Ex. E at 21:20-22:20.)

80.    At approximately 1:20 p.m. while in the Control Room, Officer Wolfgram was eating his lunch: a hot ham and cheese. (Ex. E at 20:14-24; Ex. H at 16:21-17:4.)

81.    At approximately 1:22 p.m., Telford walked into Proft's cell and spoke briefly to Proft before exiting the cell. (Ex. F at 1:22:35 – 1:22:48.)

82.    Telford then continued walking laps on the catwalk for about two minutes, without interacting with anyone and while passing Proft's cell multiple times, before again entering Proft's cell at approximately 1:24 p.m. when he began assaulting Proft. (Ex. F at 1:22:48 - 1:24:40.)

83.    At almost this exact same time of 1:24 p.m., Officer Baerber joined the other officers in the Control Room of WCJ's Adult Pod to escort an inmate to court. (Ex. G at 1:24:39 – 1:24:45; Ex. A at 46:5-7.)

84.    On the afternoon of August 17, 2021, Officer Baerber was working as a records officer, which meant that she was generally tasked with, among other things, handling court paperwork, tracking probation paperwork, and tracking orders to produce and inmate court dates. (Ex. A at 14:18-25;

15:12-16:22.)

85.     About one minute after Telford entered Proft's cell, other Adult D Pod inmates exited their cells at various intervals, with some returning to their cells while others walked around the dayroom, spoke with each other, glanced toward Proft's cell, and one appeared to use the TV remote. (Ex. F at 1:25:25 – 1:27:50.)

86.     At approximately 1:26 p.m., Officer Bryant exited the Control Room to the hallway[5] area surrounding the exterior of the Control Room and approached Adult C Pod to retrieve an inmate for a video court hearing. (Ex. G at 1:25:50 – 1:27:05; Dec. of Bryant, ¶ 3, Ex. X.)

87.     About 30 seconds later, Officer Baerber exited the Control Room to the vestibule outside of Adult Pods B and C to retrieve an inmate for a video court hearing. (Ex. G at 1:26:55 – 1:27:05; Ex. H at 58:23-59:4; Dec. of Baerber, ¶ 3, Ex. W.)

88.     At approximately 1:27 p.m., while still in the hallway next to the Control Room, Officers Bryant and Baerber began placing handcuffs and belly chains on the two inmates who they were going to escort to court hearings. (Ex. G at 1:27:00 – 1:27:20; Exs. W, X.)

89.     As she was placing belly chains on her inmate, Officer Bryant heard faint yelling but could not tell where it was coming from. (Ex. B at 33:11-13; Ex. X.)

90.     From her position in the hallway, Officer Bryant looked into Adult D Pod and saw a couple of inmates walking around the dayroom who did not appear to be reacting to any situation, and she did not see any disturbance. (Ex. B at 33:22-34:3; Ex. X.)

91.     Officer Bryant alerted Officer Baerber that she thought something was going on in the housing unit but that she could not see any disturbance. (Ex. A at 18:16-24; Exs. W, X.)

---

[5] For the sake of clarity, the area surrounding the Control Room is referred to in depositions as a "hallway," a "vestibule," and also "B, C, D, E." Housing units B, C, and D share a vestibule off of the hallway (*see, e.g.*, Ex. H at 76:11-77:4). Throughout these proposed facts, those terms are used interchangeably to refer to the same general area that surrounds the Control Room and separates it from the locked housing units in the Adult Pod.

92.    Officer Baerber, who did not hear anything, then looked into Adult D Pod and first saw a couple of inmates in the dayroom who did not appear in distress and who did not otherwise appear to be reacting to anything. (Ex. A at 18:20-19:4, 19:22-20:11, 30:14-25, 69:25-70:2; Ex. W.)

93.    As Officer Baerber was looking into Adult D Pod, Officer Bryant alerted Officers Weddig and Wolfgram in the Control Room that she was hearing yelling and thought there might be a fight. (Ex. B at 42:3-14; Ex. X.)

94.    Officer Weddig heard Officer Bryant, so he visually scanned the Adult Pod housing units from his position in the Control Room and did not initially see anything amiss. (Dec. of Weddig, ¶ 3, Ex. Y; *see also* Ex. G at 1:27:19-1:27:57)

95.    At approximately 1:28 p.m., Proft appeared face down on the ground in the doorway of his cell with Telford on top of him. (Ex. F at 1:27:50.)



(Ex. F at 1:27:51.)

96.    At this same time, Officer Baerber continued to look around Adult D Pod and saw Proft crawl out of his cell with his eyes swollen. (Ex. W; Ex. A at 19:2 – 7.)

97.    At this same time, Officer Bryant looked back into Adult D Pod and saw Telford coming out

of Proft's cell with Proft on the ground. (Ex. X.)

98.     At this same time, in the Control Room, Officer Huybers turned on the Adult D Pod intercom to investigate, at which point he heard noise and then observed two inmates coming out of Proft's cell who appeared to be involved in an altercation. (Dec. of Huybers, ¶ 3, Ex. AA.)

99.     Upon seeing Proft crawl out of his cell with his eyes swollen, and before even seeing Telford assaulting Proft, Officer Baerber immediately called a "Code Red, Fight in Adult D Pod," which aired over the radios at 1:28:19 p.m. (Ex. W; Ex. A at 19:5-10, 70:18-71:5; Ex. H at 175:7-8.)

100.    After hearing the Code Red, Officer Weddig and Officer Wolfgram saw Telford assaulting Proft on the upper tier in Adult D Pod. (Ex. Y; Ex. E at 71:1 – 17.)

101.    Upon hearing the Code Red, Officer Huybers used the intercom in Adult D Pod to order all inmates to lock into their cells. (Ex. AA.)

102.    Officers Weddig and Wolfgram ran to the vestibule outside Adult D Pod as the other inmates in Adult D Pod returned to their cells in response to Officer Huybers' command. (Ex. Z; Ex. E at 71:5-12; Ex. G at 1:27:55 – 1:28:05.)

103.    Because Telford was not locking into his cell as ordered, Officer Wolfgram yelled through the food pass opening in the pod door at Telford to lock into his cell. (Ex. Z; Ex. E at 71:9-12; Ex. F at 1:28:13 – 1:28:45.)

104.    After the Code Red was called, Officer Bryant escorted her inmate out of the hallway and secured him in the video courtroom. (Ex. X.)

105.    After calling the Code Red, Officer Baerber escorted her inmate out of the hallway and secured him in a visiting booth. (Ex. W.)

106.    Officer Weddig then ran and grabbed the Adult Pod medical bag and yelled down the hallway towards the nurse's office that a nurse was needed. (Ex. Y.)

107.    Over the next minute, additional officers arrived in the hallway outside of Adult D Pod as

Telford continued to pace in the housing unit and would not lock into his cell. (Ex. Y; Ex. F at 1:28:40 – 1:29:20; Ex. G at 1:28:35 – 1:29:30.)

108.    At 1:29 p.m., officers opened the door to Adult D Pod and again ordered Telford, who was pacing back and forth over Proft's body, to lock into his cell. (Ex. F at 1:29:22 – 1:29:30.)

109.    Within less than 10 seconds of opening the door to Adult D Pod, multiple officers entered the housing unit and one of them pointed her Taser at Telford as they continued ordering him to lock into his cell. (Ex. F at 1:29:22 – 1:29:34.)

110.    Within less than 10 seconds, Telford locked into his cell as responding officers began approaching the steps up to the second tier. (Ex. F at 1:29:34-1:29:42.)

111.    As Telford's cell door was closing, at least seven responding officers entered the housing unit along with a nurse and went to Proft to assist him. (Ex. F at 1:29:42-1:29:56.)

112.    Officers Baerber, Bryant, Weddig, Wolfgram, and Huybers do not recall exactly what they were discussing in the Control Room between about 1:20 p.m. and 1:28 p.m., but to the best of their recollection, they each believe they were discussing work-related matters. (Dec. of Baerber, ¶ 5; Dec. of Bryant, ¶ 5; Dec. of Weddig, ¶ 6; Dec. of Wolfgram, ¶ 6; Dec. of Huybers, ¶ 5; Ex. E at 21:20-23:9.)

113.    It was the policy and practice of Washington County that WCJ corrections officers were required to meet the standards and requirements of training for correctional officers established by the Law Enforcement Standards Board of the State of Wisconsin. (Dec. of Lehman, ¶ 7.)

114.    Washington County Jail correctional staff are not trained medical professionals and play no role in providing medical care to inmates other than basic first aid as needed. (Dec. of Lehman, ¶ 12.)

115.    Proft was classified as medium security during his primary classification because he had a criminal conviction for armed robbery and was incarcerated on a felony probation hold. (Ex. H at 209:19-210:13, 213:12-18.)

116.    Telford was classified as medium security during his primary classification because he was

incarcerated on charges that included two violent offenses (robbery with use of force, and strangulation and suffocation). (Ex. H at 209:19-210:13; Ex. U.)

117.  At the time of his primary classification, Telford did not have any prior felony convictions on his record. (Ex. H. at 209:12-14.)

Dated this 30th day of January, 2026.

By: *s/ Sara C. Mills*
  SAMUEL C. HALL, JR.
  State Bar No. 1045476
  SARA C. MILLS
  State Bar No. 1029470
  ZACHARY J. FLOOD
  State Bar No. 1099136
  CRIVELLO, NICHOLAS & HALL, S.C.
  Attorneys for Defendants Washington County,
  Martin Schulteis, Tim Huybers, Sean Wolfgram,
  Brian Weddig, Andrea Bryant and Gloria
  Baerber
  710 N. Plankinton Avenue, Suite 500
  Milwaukee, WI  53203
  Ph: (414) 271-7722
  Fax: (414) 271-4438
  E-mail:  shall@crivellolaw.com
       smills@crivellolaw.com
       zflood@crivellolaw.com