# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

ESTATE OF JALEN PROFT,
by Mary Jane Proft as Special Administrator,

        Plaintiff,

                                  Case No: 24-CV-982

v.

WASHINGTON COUNTY, MARTIN SCHULTEIS,
BRIAN WEDDIG, SEAN WOLFGRAM, ANDREA
BRYANT, GLORIA BAERBER, TIM HUYBERS, JOHN
DOES 1-10 and ABC INSURANCE COMPANY

        Defendants.

---

## DEFENDANTS' BRIEF IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE EXPERT TESTIMONY AND OPINIONS BY STEPHEN SINCLAIR

---

### INTRODUCTION

      Defendants Washington County (the "County"), Martin Schulteis ("Sheriff Schulteis"), Brian Weddig ("Officer Weddig"), Sean Wolfgram ("Officer Wolfgram"), Andrea Bryant ("Officer Bryant"), Gloria Baerber ("Officer Baerber"), and Tim Huybers ("Officer Huybers"), by their attorneys Crivello, Nichols & Hall, S.C., respectfully submit this Brief in Support of their *Daubert*[1] Motion to Preclude Expert Testimony and Opinions by Stepehen Sinclair ("Sinclair") in this matter. Barring Sinclair as an expert witness is warranted for several reasons. First, Plaintiff's expert disclosures do not comply with Rule 26(a)(2)(B). Second, Sinclair offers inadmissible legal conclusions which will only serve to unfairly prejudice Defendants if admitted. Third, Sinclair's opinions are not

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

supported by sufficient facts or data. Instead, they are based on speculative assumptions and Sinclair's *ipse dixit*. Fourth, the opinions offered by Sinclair are not the products of reliable methodology or principles. Consequently, Sinclair's opinions and testimony are unreliable and inadmissible, and he should not be permitted to testify as an expert witness in this matter.

## RELEVANT BACKGROUND

### I.     PLAINTIFF'S CLAIMS AGAINST DEFENDANTS.

This action arises from George Telford's ("Telford") fatal attack on Jalen Proft ("Proft") at the Washington County Jail ("WCJ" or the "Jail") on August 17, 2021. (*See generally* Dkt. 40). Proft and Telford were inmates at the WCJ when this incident occurred. (*Id.*) Proft's estate brought this action against WCJ correctional staff who worked at the Jail on August 17, 2021, Sheriff Schulties, and Washington County. (*Id.*) Plaintiff's Second Amended Complaint (the "Operative Complaint") asserts the following causes of action arising under federal law:[2]

1) Count I – 42 U.S.C. § 1983 – Deliberate Indifference in Violation of Both the Fourth and the Fourteenth Amendment (Against Defendant Guards).[3]

2) Count II – 42 U.S.C. § 1983 – Deliberate Indifference in Violation of Both the Fourth and the Fourteenth Amendment (Against Defendant Guards and County).[4]

3) Count III – 42 U.S.C. § 1983 – Fourteenth Amendment Municipal (*Monell*) Liability (Against Defendant County and Sheriff Schulteis).

(Dkt. 40, pp. 25-32). Plaintiff asserts the following causes of action in the Operative Complaint exclusively under Wisconsin state law:

4) Count IV – Failure to Train and Supervise (Against County and Schulteis – pursuant to Wisconsin Law).

5) Count V – Violation of Wis. Stat. § 895.04 (Wrongful Death) (All Defendants).

---

[2] The claims identified herein are labeled as they appear in Operative Complaint. (Dkt. 40, pp. 25-36).

[3] The term "Defendant Guards," as used in the Operative Complaint, refers only to Officers Weddig, Wolfgram, Bryant, Baerber, Huybers, and the John Doe defendants 1-10. (*Id.*, p. 5 at ¶ 15). Count I of the Second Amended Complaint is only against these individuals; it is not pled against Sheriff Schulties or the County. (*Id.*, p. 25).

[4] Count II of the Operative Complaint is not pled against Sheriff Schulties in his individual capacity. (*Id.*, pp. 5, 27).

6) Count VI – Violation of Wis. Stat. § 101.11 (Safe Place Claim) (Washington County).

7) Count VII – Negligence (All Defendants).

(*Id.*, pp. 32-36).

## II. DISCOVERY PRE-DATING PLAINTIFF'S EXPERT DISCLOSURES.

### A. <u>Written Discovery.</u>

Before disclosing Sinclair as an expert witness in this matter, Plaintiff provided its responses to Defendants' First Sets of Interrogatories, Requests for Production, and Requests for Admission, as well as its responses to Defendants' Second Set of Interrogatories and Requests before it disclosed Sinclair as an expert witness in this matter. (Flood Decl., ¶ 2, Ex. A). Defendants also served their responses to Plaintiff's First Set of Requests for Production, Plaintiff's Second Set of Requests for Production, and their supplemental responses to Plaintiff's First Set of Requests for Production prior to Plaintiff disclosing its expert witnesses. (*Id.*, ¶ 3, Ex. B).

All documents, records, and communications Defendants have produced in discovery are bates labeled as "COUNTY-JP" followed by the corresponding six-digit bates numbers. (*Id.*) Between December 13, 2024, and February 5, 2025, Defendants produced over two thousand pages of documents in response to Plaintiff's discovery, in addition to more than 100 video files collectively consisting of well over 24 hours of Jail's surveillance video footage. (*Id.*, ¶ 4). The documents—i.e., the non-video materials—Defendants produced between these dates are collectively labeled as COUNTY-JP000001-002282. (*Id.*, ¶ 3, Ex. B).

### B. <u>Depositions.</u>

#### 1. Washington County's Rule 30(b)(6) Deposition.

On December 30, 2024, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff conducted the deposition of the County's designated corporate representative, Captain Scott Lehman ("Capt. Lehman"). (Dkt. 54-8). During this deposition, Plaintiff introduced several exhibits which were

represented to be screenshots from videos Defendants produced in discovery. (*Id.*, pp. 41-46, 50, 56-58, 61, 63, 65, 82, 85, 89, 91-92, 95, 97, 99, 115, 117, 122, 124). Defendants' counsel noted that the videos produced in discovery displayed the time of day the video footage was recorded, and the deposition exhibits did not. (*Id.*, pp. 41:9 – 42:7, 43:12 – 44:19, 117:21 – 121:2). Plaintiff's counsel advised that videos Defendants produced in discovery were converted from the format in which they were produced to an MP4 file format, and that the screenshot exhibits were from the videos produced in discovery after they had been converted. (*Id.*, pp. 43:20 – 44:19, 117:21 – 121:2).

Instead of showing the time of day the footage was recorded, the deposition exhibits displayed the length of the video in hours/minutes/seconds and the hour/minute/second mark relative to the video's length from which the screenshot was captured (e.g. 00:06/40:00). (*Id.*, pp. 43:3-21, 42:18 – 44:10, 117:21 – 121:2). The following exchange occurred between counsel on this issue:

> [DEFENDANTS' COUNSEL]: We produced [jail surveillance videos] how they've been stored.
>
> [PLAINTIFF'S COUNSEL]: I understand that, and as I was saying, the other individual said there was an issue when he converted these over to MP4s so we could play them, so . . .
>
> [DEFENDANTS' COUNSEL]: I just want the record to be abundantly clear that these are not what we produced and they include time stamps that aren't on what we produced. So they've been altered by the conversion. I'm not implying that they were intentionally altered or anything like that or anything nefarious, but they are not the same as what we've produced.

(*Id.*, pp. 117:21 – 121:2).

When Capt. Lehman was asked questions about the time of day the events depicted in the screenshot exhibits occurred, he was unable to provide answers without seeing a video or screenshot of a video with the time stamps showing the time of day. (*Id.*, pp. 43:12-18, 48:5-9). At one point, Capt. Lehman stated:

> So in regards to these pictures which do not show time stamps, I cannot speak to the time frames. I understand that there are numbers underneath, but I don't know what those numbers are because they didn't come from our system.

(*Id.*, pp. 43:12-18, 48:5-9). Additionally, Capt. Lehman testified that the report from Ozaukee County regarding its independent investigation of this incident noted that the time-of-day stamps in the videos it reviewed from the Jail's surveillance cameras were approximately 20 seconds off from the actual time of day. (*Id.*, pp. 86:20 – 89:2).

### 2. Party and Fact Witness Depositions.

Plaintiff also deposed the correctional officer Defendants and two other non-party fact witnesses prior to disclosing its expert witnesses in this case. Officers Baerber's, Weddig's, and Huybers' depositions occurred on June 30, 2025, and Officers Wolfgram's and Bryant's depositions took place on July 2, 2025. (Dkt. 54-1, 54-2, 54-3, 54-4, 54-5). On August 27, 2025, Plaintiff took the fact depositions of Capt. Lehman and Jail Lieutenant, Rick Miller. (Flood Decl., ¶ 6).

## III. PLAINTIFF'S EXPERT DISCLOSURES.

The Amended Scheduling Order required Plaintiff to "disclose the identities of expert witnesses along with reports and supporting documentation, no later than the end of the day on **August 29, 2025**." (Dkt. 51, p. 2) (emphasis in original). On August 4, 2025, counsel stipulated to extend Plaintiff's expert disclosure deadline to September 29, 2025. (Flood Decl., ¶ 5). On September 26, 2025, Plaintiff disclosed Stephen Sinclair as its retained expert witness in this matter pursuant to Fed. R. Civ. P. 26(a)(2)(B). (*Id.*, ¶¶ 7-10, Ex. C-F). The disclosure included Sinclair's expert report (the "Report"), which sets forth his qualifications, fee schedule, and opinions he intends to offer in this matter. (*Id.*, ¶ 8, Ex. D). Attachment A to the Report is Sinclair's curriculum vitae ("CV"), which also includes names of cases in which he has given testimony as an expert witness. (*Id.*, ¶¶ 9, 11, Ex. E, G at pp. 8:19 - 9:20). Attachment B is a list of materials Sinclair reviewed and relied upon to formulate the opinions expressed in his Report (hereafter the "Materials Reviewed List"). (*Id.*, ¶¶ 10-11, Ex. F, G at pp. 8:19 - 9:20, 19:11-22).

### A.  The Materials Reviewed List.

The Materials Reviewed List does not identify any video recordings of the subject incident that Sinclair reviewed in connection with this case. (*Id.*, ¶ 10, Ex. F). Except for the transcript of the County's Rule 30(b)(6) deposition, the Materials Reviewed List also does not include the transcripts of Officers Weddig, Wolfgram, Bryant, Baerber, Huybers, Lt. Miller, or Capt. Lehman's fact depositions. (*Id.*) Defendants' responses to Plaintiff's First Set of Requests for Production, its Second Set of Requests for Production, and Defendants' supplemental responses to Plaintiff's First Set of Requests for Production are also not identified as materials Sinclair reviewed in the Materials Reviewed List. (*Id.*) Plaintiff's responses to Defendants' First Sets of Interrogatories, Requests for Production, and Requests for Admission, and Plaintiff's responses to Defendants' Second Set of Interrogatories and Requests for Production are likewise not included in the Materials Reviewed List. (*Id.*) The only materials specifically labeled as documents produced by a Defendant in the Materials Reviewed List are "docs produced by county on 1-29-2025 – county-jp001638-002279" in item no. 8 on the list. (*Id.*)

### B.  Opinions Set Forth in Sinclair's Report.

Based on Sinclair's "36 years of experience in adult corrections, previous expert witness work, and review of the materials provided[,]" he offers the following opinions in Section III of his Report entitled "Summary of Opinions":

> i. The Washington County Jail Defendant staff were *negligent and derelict in their duties* at the time of Mr. Telford's brutal assault of Mr. Proft. They failed in their core duties of observation and awareness. [(hereafter referred to as "Opinion #1")].
>
> ii. The Washington County Jail Defendant staff allowed a *known* blind spot and gap in their security system to remain uncorrected, contributing to the brutal assault and eventual death of Mr. Proft. [(hereafter referred to as "Opinion #2")].

(*Id.*, ¶ 8, Ex. D at p. 6, ¶ 17(i)-(ii) (emphasis added)).

1. **Opinion #1.**

Sinclair's Report is not critical of Defendants' response to this incident after they became personally aware that an assault was occurring. (*Id.*, Ex. D at p. 8, ¶ 21). Sinclair opines that, "[w]hen the staff finally detected the assault, they acted within commonly accepted correctional practices and performed their duties. (*Id.*) Instead, Sinclair's opinion that the Defendant-Officers were negligent in performing their duties only concern the "the actions or inactions that *led up to the assault* and eventual death of Mr. Proft." (*Id.*) (emphasis added).

In this regard, Sinclair conclusively states in his Report, "I know there is a common expected practice that correctional officers perform *constant observation* and awareness of their assigned area of responsibility as well as on the cameras." (*Id.*, Ex. D at p. 12, ¶ 28) (emphasis added). Sinclair also relies on the American Correctional Association's ("ACA") standards for adult confinement facilities and jails regarding correctional officers' observation of inmates to inform the standard he applied to formulate his opinion that Defendants were negligent and derelict in their duties. (*Id.*, Ex. C at p. 11, ¶ 28). Otherwise, Sinclair's Report discusses Wis. Stat. § 302.41,[5] Wis. Admin. § DOC 350.18, select internal policies and procedures of the WCJ, and Capt. Lehman's Rule 30(b)(6) testimony regarding officers' observation and monitoring duties to establish the standard of care he opines was breached due to Defendants' negligence. (*Id.*, Ex. D at pp. 7, 10-13, 15-16 ¶¶ 24-25, 27-28, 32).

Sinclair asserts the following legal conclusion in the guise of an opinion: "Based on the standards and expectations prescribed by WCJ, it is clear to me that the correctional officer defendants were negligent in their duties and responsibilities, and this was the root cause of the sustained assault on Mr. Proft." (*Id.*, Ex. C at p. 16, ¶ 32). He further speculates, "I believe that if the WCJ Defendant staff had placed greater importance on their primary responsibilities, the assault would have been

---

[5] Wis. Stat. § 302.41 applies to state prisons in Wisconsin, not County jails. *See* Wis. Stat. § 302.01.

identified and responded to sooner." (*Id.*, Ex. C at p. 7, ¶ 19). The Report provides that when the assault began:

> [T]he correctional officer Defendants . . . were not actively patrolling where they could hear and see the detainees. Instead, they were all inside a control booth where they could not hear Mr. Proft's calls for help or the commotion associated with an assault. Additionally, they were clearly not monitoring the cameras to see how the other inmates were behaving during the assault. In the exhibits provided (4-8), which are still shots taken from the video inside the control booth *at the time of Mr. Proft's assault, the four and then five corrections officers who could and should have been paying attention to their areas of responsibility, as well as the cameras were, in my opinion, chatting and not appropriately paying attention.*[6]

(*Id.*, Ex. D at p. 13, ¶ 30) (emphasis added). Referring to Exhibit 8 from the County's Rule 30(b)(6) deposition—a screenshot of a video produced by Defendants, which was converted to a different format by Plaintiff and does not identify the time of day, establish Proft or Telford's locations, or the sequence point of Telford's attack at the time of the screenshot—Sinclair deduces in his Report:

> *At this point*, it does not appear that there are any direct observations taking place, and the secondary method using the monitors for the video cameras, which are just above and to the left of Correctional Officer Bryant's head, are not being utilized. [ . . . ] [I]f anyone present had been observing the cameras on the monitor or performing direct observation of the living units to observe what was taking place, the code red would have been called sooner. *Because of this, it is my opinion that the involved officers were distracted while socializing with each other and not performing their assigned duties.*

(*Id.*, Ex. D at p. 15, ¶ 31) (emphasis added). Sinclair ultimately concludes that "the WCJ Defendant staff were not vigilant in their duties and, because of this, allowed a sustained brutal attack to take place under their watch." (*Id.*, Ex. D at p. 16, ¶ 34).

### 2. Opinion #2.

Sinclair's opinion that "[t]he Washington County Jail Defendant staff allowed a known blind spot and gap in their security system to remain uncorrected[,]" appears to refer to the location of Proft's assigned cell, where the assault began, and the individual Defendants' ability to see and hear

---

[6] Upon information and belief, exhibits 4-8 mentioned in this paragraph of the Report refer to the screenshots from the converted video files that were marked as exhibits 4-8 in the Rule 30(b)(6) deposition of Capt. Lehman on December 30, 2024. (*See Id.*, Ex. C at pp. 14-15).

inside the cell from the officer control pod in this area of the Jail. (*See id.*, Ex. D at pp. 8-9, 16-17, ¶¶ 22-23, 33-34). The Report confirms that Sinclair has never been to or inspected the WCJ, or the area where this incident occurred. (*Id.*, Ex. D at p. 8, ¶ 22). Instead, his understanding of the physical layout of the incident location and the officers' control pod is based on the description of this area provided in an Ozaukee County Sheriff's Office detective's report regarding its investigation of this incident. (*Id.*)

In support of his opinion that WCJ staff knew there was a "blind spot" and a "gap in their security system" prior to this incident and failed to correct it, the Report relies on post-incident investigation reports authored by Detectives Buechler and Haas of the *Ozaukee County Sheriff's Office*. (*Id.*, Ex. D at pp. 8-10, ¶¶ 22-23). The portion of Detective Buechler's report cited in Sinclair's Report indicates that he and Detective Haas inspected the adult pod section of the Jail, and they:

> [B]oth noticed cell #1 in "D" pod is the most difficult area of the tier to see from the control pod. When the cell door is open, the steel door itself partially blocks the window view into the cell bunk area. Additionally, we noted that from ground level it is difficult to see into the cell or the mezzanine walkway floor.

(*Id.*, Ex. D at p. 9, ¶ 23).

The only statements attributed to WCJ staff concerning the visibility of this incident the Report discusses to support Sinclair's conclusion that each individual Defendant had pre-incident knowledge of a blind spot and gap in security are Officers Wolfgram and Weddig's statements that were summarized by Detective Haas in his investigative report. (*Id.*) Detective Haas' report provides that Officer Wolfgram described Proft's cell as "the worst area in the Tier for a fight to happen due to the angle from the control pod." (*Id.*) Detective Haas further reported that, "Officer Wolfgram said the door, when opened, blocks visibility into the cell and the only way to detect the fight sooner, would have been if an officer happened to be looking that way when Telford entered the cell." (*Id.*) The portion of Detective Haas' report Sinclair discusses in relation to Officer Weddig indicates that Officer Weddig described Proft's cell to Detective Haas as having "a, 'real tough angle' and you have

to, 'Make a real point at looking into that part of D Pod.'" (*Id.*) No similar statements by another WCJ staff member are identified in the Report, and it includes no analysis as to how Sinclair concluded that *Detective Haas'* description of Officers Wolfgram's and Weddig's statements establish every Defendant's knowledge of the purported security gap. (*See generally id*, Ex. D).

Sinclair states in his Report that he "found no evidence [Defendants] made changes to prevent similar situations in the future[,] and that he "believe[s] there were operational changes that could and should have mitigated this incident." (*Id.*, Ex. C at p. 16, ¶¶ 32-33). In this regard, the Report provides:

> Based on *the knowledge* that the cell Mr. Proft was assigned to was "*the worst area for a fight to happen due to the angle from the control pod.*" Why does WCJ continue to use it? They could and should have "deadlined" the cell and not used it. They could barricade or create out-of-bounds areas to prevent inmates from entering blind spots. Through a memorandum or administrative bulletin, they could clarify expectations around staff observations and awareness, perhaps by requiring one of the corrections officers assigned to the area to be outside the control both at all times so they can hear what is happening in the living units. The failure to adapt to a known blind spot, paired with the inattentiveness of the correctional officers, had a causal impact on Mr. Proft's death.

(*Id.*, Ex. D at p. 16, ¶ 33) (emphasis in original).

## IV.    SINCLAIR'S DEPOSITION TESTIMONY.

Sinclair's deposition occurred on January 19, 2026, during which he authenticated his Report, CV, and Materials Reviewed List. (*Id.*, ¶ 11, Ex. G, pp. 8:19 – 10:19, 15:1 – 16:24, 19:11 – 20:22). Sinclair confirmed that his Report is complete, and it contains all expert opinions he intends to offer in this case; he also explained that the term "WCJ Defendant staff," as used in his Report, encompasses the individual correctional officer Defendants and Sheriff Schulties. (*Id.*, Ex. G, pp. 16:25 – 17:3, 61:1-10). Sinclair further clarified that paragraph 17, subparagraphs "i" and "ii," on page 6 of the Report represent Sinclair's opinions in this matter, *i.e.*, Opinion #1 and Opinion #2, and that the following portions of his Report comprise his analysis and reasoning for the opinions expressed in paragraph 17. (*Id.*, Ex. G, pp. 50:7 – 51:12; *see also id.*, ¶ 8, Ex. D, p. 6, ¶ 17(i)-(ii)).

Regarding the WCJ's documented policies and procedures Sinclair reviewed and/or discussed in the Report, he stated that he applauded their high standards, and that he does not believe the policies or procedures themselves that caused the assault. (*Id.*, ¶ 11, Ex. G, pp. 116:24 – 118:20). Rather, Sinclair's opinion is that the individual Defendants did not adhere to the County's internal policies and procedures, and their inattentiveness and negligence resulted in them not realizing an assault was ongoing sooner. (*Id.*). Sinclair also confirmed that he did not consider—and is not expressing any opinion regarding—the Jail's inmate classification process, or the security classification assigned to Proft or Telford when this incident occurred. (*Id.*, Ex. G, pp. 114:18 – 115:8).[7]

## LEGAL STANDARD

Plaintiff bears the burden of establishing that Sinclair's testimony and opinions are admissible. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Rule 702 states in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>    (a)   the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>    (b)   the testimony is based on sufficient facts or data;
>
>    (c)   the testimony is the product of reliable principles and methods; and
>
>    (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[7] The remainder of Sinclair's deposition testimony relevant to Defendant's *Daubert* motion is addressed *infra*, in the Argument section of this Brief.

Before admitting Sinclair's testimony under Rule 702, the Court must ensure his proposed testimony is both reliable and relevant. *Higgins v. Koch Development Corp.*, 794 F.3d 697, 705 (7th Cir. 2015). The Court enjoys broad discretion in evaluating reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). In reaching its decision, the Court must assess whether Sinclair's opinions are grounded in "methods and procedures of science," whether they consist of more than simply a "subjective belief or unsupported speculation," and "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. In addition, the Court must determine whether Sinclair is "proposing to testify about matters growing naturally and directly out of research [he] ha[s] conducted independent of the litigation, or whether [he] ha[s] developed [his] opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

The reliability inquiry should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Likewise, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* (internal quotations omitted).

## **ARGUMENT**

## I. **PLAINTIFF'S FAILURE TO COMPLY WITH RULE 26(a)(2)(B) REQUIRES THE EXCLUSION OF SINCLAIR'S EXPERT TESTIMONY.**

Rule 26(a)(2)(B) governs a party's disclosure of a retained expert witness, such as Sinclair in this matter. Fed. R. Civ. P. 26(a)(2)(B). The disclosure must be made "at the times and in the sequence that the court orders[,]" or, "[a]bsent a stipulation or court order," no later than the times set forth in Rule 26(a)(2)(D)(i)-(ii). Based on the parties' stipulation, Plaintiff was required to provide Defendants

with the items and information listed in Rule 26(a)(2)(B)(i)-(vi) no later than September 29, 2025.

(Flood Decl., ¶ 5). However, Plaintiff's disclosure of Sinclair in this matter falls woefully short of the

requirements set forth in Rule 26(a)(2)(B), pursuant to which the disclosure must include the expert's

report and contain:

> (i)    a complete statement of all opinions the witness will express *and the basis and reasons for them*;
>
> (ii)    *the facts or data considered by the witness in forming them;*
>
> (iii)    *any exhibits that will be used to summarize or support them;*
>
> (iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v)    *a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition*; and
>
> (vi)    a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Under Rule 37(c)(1), failure to comply with Rule 26(a)

results in an "automatic and mandatory" exclusion unless the non-compliance is "justified or

harmless." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *Musser v. Gentiva Health

Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)); *see also Dilley v. Holiday Acres Properties, Inc.*, 2017 WL 2371295,

at *2-3 (W.D. Wis. May 31, 2017).

Sinclair should be barred as an expert in this matter because Plaintiff's disclosure is

noncompliant with 26(a)(2)(B), particularly under (i)-(iii) and (v). Although the Materials Reviewed

List was included with Plaintiff's disclosure, Sinclair's deposition testimony confirmed that it does not

include all materials, facts, and data he considered in forming his opinions. Sinclair initially testified

that the Materials Reviewed List identified all materials he reviewed to formulate the opinions in his

Report, and that he did not review any other materials, including videos, which are not identified in

the Materials Reviewed List. (Flood Decl., ¶ 11, Ex. G, pp. 19:11 – 20:17). Notably, the Materials

Reviewed List does not identify any video footage Sinclair reviewed, considered, or relied upon in forming his opinions. (*Id.*, ¶¶ 10-11, Ex. F, G at pp. 24:22 – 25:14).

However, his Report references "video" and "camera footage" at various points. (*Id.*, ¶ 8, Ex. D, p. 3, ¶ 3 ("... *security video captures* Mr. Telford entering Mr. Proft's cell .... "*security camera footage showed* ....") p. 16, ¶ 34 (... based on the information provided, *including video* ....")) (emphasis added). The Report's vague references to video footage do not identify which video(s) the Report is referring to. (*Id.*) Two of the three instances in which the Report refers to video or camera footage in a manner suggesting Sinclair reviewed video to form his opinions do not include any citations to case materials or video evidence. (*Id.*). The other instance—where Sinclair states, "This continued for several minutes until *security camera footage showed* Mr. Proft and Mr. Telford spilling out onto the tier in front of the cell; Mr. Proft was dragged out of the cell by Mr. Telford"—is followed by a footnote citation listing "Exhibit 40, Ozaukee Sheriff's Office Incident report; Bates 000615." (*Id.*, Ex. D, p. 3, fn. 3) (emphasis added). None of the materials cited in this footnote are video files.

When asked about this at his deposition, Sinclair confirmed that he reviewed video footage prior to drafting his Report:

> I'd like to correct my previous answer; and that is, as much as I believed [the Materials Reviewed List] was a full list, I may have overlooked a file in my system that would reflect the videos that were provided and in which I reviewed, and so I would be happy to amend my report with an updated list that would include those videos.

(*Id.*, ¶ 11, Ex. G, pp. 23:19-21, 24:22 – 25:13). Sinclair could not identify the specific videos, but stated they were produced by Defendants in discovery, and he recalled reviewing "the cameras that showed the actual assault on the tier and some videos of staff outside . . . of the control booth." (*Id.*, Ex. G, pp. 23:22 – 24:6).

Within the Report, there are pictures of two exhibits from the County's Rule 30(b)(6) deposition, which are screenshots of the video(s) converted to a different file format by Plaintiff. (*Id.*, ¶ 8, Ex. D, pp. 14-15). Sinclair was unable to confirm whether he reviewed the videos from which the

screenshots were captured. (*Id.*, ¶ 11, Ex. G, pp. 24:9-21). Later in his deposition, Sinclair confusingly testified that he "did *have the ability to* view *all of the videos*," including the video from which the screenshots in his Report were taken. (*Id.*, Ex. G, p. 103:8-10). Four months after Plaintiff's expert disclosures were due, and despite Sinclair being asked at his deposition, what comprises "all of the videos" referenced by Sinclair; whether his *ability* to view video means he *actually* reviewed "all of the videos"; and most importantly, which of the 100-plus video files and 24-plus hours of footage produced by Defendants, if any, did he consider in forming his opinion: "[B]ased on the information provided, *including the video*, the WCJ Defendant staff were not vigilant in their duties and, because of this, allowed a sustained brutal attack to take place under their watch." (*Id.*, ¶ 8, Ex. D, p. 16, ¶ 34) (emphasis added).

The videos were not the only materials Sinclair appears to have considered that were not adequately disclosed by Plaintiff. Other materials were ambiguously referenced in Sinclair's Report that were not included in the Materials Reviewed List, and Sinclair was unable to further describe or identify these materials at his deposition. And at least one item on Materials Reviewed List is titled in such a way that, without clarification from Sinclair or Plaintiff, Defendants cannot determine what it is or what it may include. Item No. 12 on the Materials Reviewed List is labeled, "Review Proft.PDF." (*Id.*, ¶ 10, Ex. F). Defendants have not identified a document they produced with this file name, and all PDF documents they have produced in discovery are bates labeled. At his deposition, Sinclair did not know what item no. 12 referred to, and he could not provide any additional information as to what documents are in this file. (*Id.*, ¶ 11, Ex. G, p. 26:17-21).

As another example, the Report includes footnote citations to "Bates 000613-000614," as well as to other bates numbers which are not found on the Materials Exhibit List. (*Id.*, ¶¶ 8, 10, Ex. D, pp. 3, 8-10, fn. 3, 8-11, Ex. F). None of the citations to "Bates" within the Report contain the "COUNTY-JP" prefix Defendants included on each page of every document they produced in discovery. (*Id.*)

Notably, item no. 8 on the Materials Reviewed List identifies "docs produced by county on 1-29-2025 – county-jp001638-0022779.pdf[,]" and Sinclair testified that could not recall if he reviewed any other documents besides those in item no. 8 bearing the "COUNTY-JP" bates label. (*Id.*, ¶ 11, Ex. G, pp. 25:18 – 26:10). When asked at his deposition why the citations to "Bates" in the Report do not include the "COUNTY-JP" prefix, similar to item no. 8 on Sinclair's Materials Reviewed List, he responded: "Because they weren't included in the name of the file as I received it." (*Id.*, ¶ 11, Ex. G, pp. 23:22 - 24:21). Given that every document produced by Defendants bore the label "COUNTY-JP," Sinclair's testimony presents the obvious question: What materials were in the file Sinclair received that he considered in forming his opinions? The answer should have been within Plaintiff's expert disclosure in September 2025. Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii). It was not, and Sinclair's inability to identify these materials at his deposition provided no clarification and further confused the issue.

Relatedly, Defendants were first made aware at Sinclair's deposition that his CV, which purportedly included a complete list of cases in which he has testified as an expert in the preceding four years, was incomplete as of January 19, 2026. (*Id.*, ¶ 11, Ex. G, p. 9:1-20); *see also* Fed. R. Civ. P. 26(a)(2)(B)(v). He testified that "there's probably three or four more cases since [Plaintiff's disclosure]" in which he has testified as an expert. (Flood Decl., ¶ 11, Ex. G, p. 9:1-20). If a party discovers that a disclosure it has made under Rule 26(a) "is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[,]" that party must supplement or correct its disclosure in a timely manner. Fed. R. Civ. P. 26(e). A party's duty to supplement under Rule 26(e) applies equally to a party's disclosure of a retained expert witness under Rule 26(a)(2)(B), and this duty "extends to both information included *in the report* and to information *given during the expert's deposition*. Fed. R. Civ. P. 26(e)(2) (emphasis added); *see also* Fed. R. Civ. P. 26(a)(2)(E). After Plaintiff disclosed Sinclair, and prior to his deposition on January 19, 2026, it did not supplement its incomplete disclosures. And despite Sinclair's deposition testimony

that he "can certainly provide" the missing information, it has not been provided to Defendants since. (Flood Decl., ¶ 11, Ex. G, p. 9:18-20).

Plaintiff's noncompliance with Rule 26(a)(2)(B) is neither justified nor harmless. No reason has been provided by Plaintiff for the missing information. Further, as of his deposition, Sinclair was sufficiently unfamiliar with his own Report and the materials he relied upon for his opinions such that he could not identify the materials which should have already been disclosed. Even if Plaintiff amends its disclosures, it is too late to render the deficiencies harmless. Defendants have already deposed Sinclair, and discovery is now closed. Additionally, any supplementation by Plaintiff from this point forward will be made on or after the Court-imposed deadlines for parties to file *Daubert* motions and motions for summary judgment, and after this Motion and Defendants' Motion for Summary Judgment has already been filed. *See Dilley*, 2017 WL 2371295, at *3 (plaintiff's deficient expert disclosures were not harmless even though it amended the disclosures and stipulated to extend discovery because the new disclosure was served after defendant moved to strike plaintiff's experts and had filed for summary judgment).

As the Seventh Circuit has acknowledged:

"Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for trial. Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report." Because of these and other ways a party may be prejudiced by an improperly disclosed expert, the sanction is severe. Under Rule 37(c)(1) "exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless."

*Tribble*, 670 F.3d at 759-60 (citing *Musser*, 356 F.3d at 757-58; Fed. R. Civ. P. 37(c)(1)). Plaintiff's deficient disclosure deprived Defendants of a meaningful opportunity to question Sinclair about the bases for his opinions, or the facts and data he considered in forming them at his deposition. Under the circumstances and given that discovery has closed and dispositive motions are due as of the

undersigned date, permitting Sinclair to expand upon and testify to these matters for the first time at trial will unfairly prejudice Defendants.

## II.    SINCLAIR'S OPINIONS ARE INADMISSIBLE.

Aside from Plaintiff's incomplete disclosure, precluding Sinclair from testifying as an expert is also warranted because his opinions are inadmissible under Fed. R. Evid. 702. Opinion #1 represents is not an opinion within Sinclair's expertise. Instead, it constitutes a legal conclusion and should be struck on that basis alone. Additionally, Opinions #1 and #2 are unreliable and will not assist the jury in understanding the evidence. Neither opinion is based on sufficient facts or data, nor are they the products of reliable methods. Rather, Sinclair's opinions are founded on speculative conclusions which have been informed by his own experiences, factual assumptions which are not supported by evidence, and standards which are inapplicable to the WCJ. Accordingly, the Court should bar Sinclair from testifying as an expert in this case.

### A.  **Opinion #1 is an Inadmissible Legal Conclusion.**

It is well-settled that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United States v. Sinclair,* 74 F.3d 753, 757 n. 1 (7th Cir.1996)). Judges, not witnesses, instruct the jury on the relevant law. *U.S. v. Caputo*, 382 F. Supp. 2d 1045, 1049 (N.D. Ill. 2005); *see also U.S. v. Johnson,* 223 F.3d 665, 671 (7th Cir.2000) ("Witnesses testify about fact, not law. When a legal proposition is relevant to the jury's consideration, the proper procedure is for the judge to instruct the jury on the proposition."). An expert opinion amounting to a legal conclusion "does little more than tell the jury what result to reach, [and is inadmissible] because such testimony is not helpful to the jury and because its probative value is substantially outweighed by the danger of unfair prejudice." *Caputo*, 382 F. Supp. 2d at 1049 (citing *Good Shepherd Manor Found., Inc.*, 323 F.3d at 564 (collecting cases)).

Each of Plaintiff's Wisconsin law claims is founded in negligence. (Dkt. 40, pp. 32-36, Counts IV-VII). Negligence exists where there is a duty owed to a person or property, this duty is breached by conduct which is not intentional in nature, and the conduct was a substantial factor in causing harm. *See A.E. Investment v. Link Builders, Inc.*, 62 Wis. 2d 479, 484-85 (1974). Under Wisconsin law, "'negligence' has prerequisite terms-of-art elements about which the jury must be instructed[,]" and an expert's opinion that someone was "negligent" is not permitted. *Lievrouw v. Roth*, 157 Wis. 2d 332, 352 (Ct. App. 1990)

Sinclair's opinion that that Defendants "were negligent and derelict in their duties" is an inadmissible legal conclusion that is outcome determinative of Plaintiff's state law claims. Excluding this opinion and related testimony is necessary to prevent Sinclair from usurping the jury's role in applying legal standards to the facts of this case, and to ensure the jury is only instructed on the law by the Court rather than by Plaintiff's expert witness. Moreover, under Wisconsin's comparative negligence framework, "The negligence of the plaintiff shall be measured separately against the negligence of each person found to be causally negligent." Wis. Stat. § 895.045. But Sinclair did not assess each individual's negligence, and he formulated his opinions on a collective basis. (Flood Decl., ¶ 11, Ex. G, p. 68:5-19). The inadmissibility of an expert's legal conclusion applies equally when considered against Plaintiff's § 1983 claims. Sinclair's opinion regarding Defendants' negligence is irrelevant to Plaintiff's § 1983 claims because negligence is not "culpable under section 1983." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (collecting cases).

Therefore, Opinion #1 will not help the jury understand the evidence in this case. It only stands to confuse the jury on the principles of the law and unfairly prejudice Defendants. Accordingly, Opinion #1 should be struck in its entirety as an inadmissible legal conclusion.

**B. Opinions #1 and #2 Are Unreliable and Will Not Assist the Jury.**

None of Sinclair's opinions are based on sufficient facts or data, and they are not the product of reliable principles and methods. For Sinclair to reliably opine on Defendants' actions and inactions leading up to the assault, the time at which the assault began, while the assault was taking place, and the time at which officers discovered and responded to the assault, at minimum, the opinion must be based on sufficient facts and data that support Sinclair's understanding of Defendants' actions and inactions, and when they occurred or did not occur within the relevant sequence of events and the assault. As will be discussed, Sinclair's deposition testimony confirms that the Report's factual conclusions regarding Defendants' actions, and the timing of their actions relative to the assault are based on Sinclair's unsupported speculations and assumptions. Because his opinions lack the necessary evidentiary foundation, they are unreliable and should be excluded.

**1. Sinclair's Opinions Are Not Based on Sufficient Facts or Data.**

Sinclair's Report states that while Telford was assaulting Proft, the officer Defendants "were not actively patrolling where they could hear and see the detainees. Instead, they were all inside a control booth where they could not hear Mr. Proft's calls for help or the commotion associated with an assault." (Flood Decl., ¶ 8, Ex. D, p. 13, ¶ 30). Sinclair further posits that, "[i]n the exhibits provided (4-8), which are still shots taken from the video inside the control booth at the time of Mr. Proft's assault, the four and then five corrections officers who could and should have been paying attention to their areas of responsibility, as well as the cameras were, in my opinion, chatting and not appropriately paying attention." (*Id.*) Referring to Defendants shown in the screenshot on page 15 of his Report, Sinclair states that evidence regarding "who was looking where and when[ ]" is:

> [I]rrelevant because if anyone present had been observing the cameras on the monitor or performing direct observation of the living units to observe what was taking place, the code red would have been called sooner. *Because of this*, it is my opinion that the involved officers were *distracted while socializing with each other* and *not performing their assigned duties*."

(*Id.*, ¶ Ex. D, p. 15, ¶ 31) (emphasis added).

The timing and sequence of events are important factual components of Sinclair's opinions. Sinclair's understanding of the underlying facts must be supported by the evidence for his opinions to be reliable and, ultimately, to be admissible. Telford's assault on Proft took place over the course of several minutes; it began inside of Proft's cell and moved to the pod's upper mezzanine, outside of the cell; and WCJ staff became aware that an assault was ongoing after Proft and Telford were no longer in the cell. As the assault was taking place and before it was detected by Jail staff, certain Defendant officers were performing other duties outside the control bubble.

However, Sinclair's Report provides no analysis or discussion as to the timing of events, or as to what each officer was doing at various points throughout the assault. Instead, the evidentiary basis for his opinions concerning Defendants' actions and inactions leading up to and during the assault are four screenshots which do not reflect the time on the date of the incident and depict no more than 4 seconds of the entire incident. His opinion that Defendants were negligent based solely on his *ipse dixit* reasoning that "the code red would have been called sooner" had they not been negligent (*Id.*, ¶ 8, Ex. D, p. 15, ¶ 31).

Although it is not specified in his Report or elsewhere in Plaintiff's disclosure, Sinclair testified that he believed part of his analysis in developing his Report included correlating the timing of the assault to what is shown in the screenshots on pages 14-15 of his Report. (*Id.*, ¶ 11, Ex. G, pp. 99:4-12). He also stated that he believed he was aware of the time of day the screenshots represented at the time he drafted his Report. (*Id.*, Ex. G, p. 98:19-24). He could not recall the time the assault began, but he assumed he correlated the timing of events to the screenshots, noting that the screenshot on page 14 of his Report "certainly wouldn't have much utility if it wasn't correlated to the timing of the incident." (*Id.*, Ex. G, pp. 98:25 – 99:12). When asked to explain how he determined the timing and sequence of the assault compared to the screenshots in his Report, Sinclair stated, "Yeah, so as I said,

I don't specifically recall how I correlated the two at this moment." (*Id.*, Ex. G, p. 102:15). He further

testified in this regard:

> Q. Can you take a minute and look through your report and point me to where --
> since you don't recall, how you correlated those? Can you tell me -- point me in your
> report where the explanation of how you correlated that is?
>
> A. I don't believe from my recall that I specifically address that.
>
> Q. So you're not able to recall today. It's not in your report. Is there any other way that
> we can determine how it was that you correlated this?
>
> A. Well, sir, I did have the ability to view all of the videos, including the video where
> this still was taken from.
>
> Q. Okay.
>
> A. And as you asked me before -- and I couldn't recall specifically if it applied to this
> case, but it's not unheard of for date stamps to not be set correctly in some videos. I
> couldn't recall specifically if that applied in this case, so that's what I know.

(*Id.*, Ex. G, pp. 102:22 – 103:17). Rather than explain the basis and methodology for the necessary

analysis absent from his Report, Sinclair's testimony further confirms his opinions are not sufficiently

supported by anything other than assumptions he has not connected to the evidence.

In addition to his failure to adequately analyze the timing of events, Sinclair's opinions that,

during the assault, Defendants were "distracted while socializing with each other and not performing

their assigned duties[,]" and that their "friendly chatting amongst colleagues cost Mr. Proft his life[ ]"

are also supported by nothing more than speculative assumptions. When asked what the officers were

"chatting" about in the screenshots shown in his Report, Sinclair answered, "I have no idea, sir." (*Id.*,

Ex. G, p. 102:15).

> Q. So you have no way of knowing whether they were communicating to each other
> about something that was within their area of responsibility?
>
> A. Well, I think it's safe to *assume* that no one was watching a camera and keyed on the
> activity that was taking place in A pod. Again, I would *assume* any capable, responsible
> correctional officer observing a significant assault would have been responsive to that.
> Based on what we know to be the facts in this case and the *outcome*, it's pretty easy to
> *assume* that they weren't.

(*Id.*, Ex. G, pp. 78:20 – 79:7) (emphasis added).

Sinclair's assumptions that Officers were not engaged in any job-related discussions or duties at this time because of the "outcome" are not tethered to any evidence, and they certainly are not based on sufficient facts or data. Because the screenshots and the camera footage of the control bubble do not have audio, the officers depicted in the screenshots are the only ones who could have personal knowledge as to the subject matter of any discussion had therein. But Sinclair did not review their deposition testimony as part of his analysis. Officer Huybers testified that, "Officer Baerber and Bryant came up just to tell us, hey, these people are going to court. We tend to maybe talk about, you know, what – somebody came or something prevalent to the job." (Dkt. 54-4, p. 25:7-11). Officer Wolfgram testified similarly. (Dkt. 54-5, pp. 21:25 - 22:9).

Notably, Sinclair acknowledged that correctional officers often have multiple responsibilities and tasks to complete "outside of, you know, monitoring and observing[,]" such as ". . . completing paperwork, answering phones, opening doors, escorting incarcerated individuals." (*Id.*, ¶ 11, Ex. G, p. 64:1-8). However, his opinions do not address how an officer's performance of another duty within their area of responsibility, such as escorting an inmate from one area to another, factored into his conclusion that Defendants were derelict in their duty to, as Sinclair puts it, "perform *constant* observation . . . ." (*Id.*, ¶ 8, Ex. D, p. 12, ¶ 28).

Sinclair also clarified at his deposition that Opinion #1 regarding the Defendants' negligent dereliction of duties also encompassed Sheriff Schulties. (*Id.*, ¶ 11, Ex. G, p. 61:1-10). His Report does not address the Sheriff's responsibilities with regard to direct observation of inmates in this area of the Jail on the date of the incident, and it includes no analysis or explanation as to how, or based on what, Sinclair determined Sheriff Schulties' negligence as it relates to the response to this incident. Moreover, Sinclair determined the primary responsibilities of Sheriff Schulties in the context of this

incident on nothing more than his "personal experience . . . where lackadaisical cultures have been allowed to exist . . . ." (*Id.*, ¶ 11, Ex. G, p. 62:8-23).

The evidence relied upon by Sinclair in support of Opinion #2—that each Defendant, prior to the assault, knew there was a "blind spot" and "gap in security"—is also lacking, and this opinion is insufficiently supported to be admissible. According to Sinclair, "it was common knowledge amongst staff that there was a challenge in seeing that area[,]" and that the alleged blind spot was commonly known to Jail staff prior the assault. (*Id.*, Ex. G, pp. 86:16-18, 108:1-4). The evidence Sinclair considered in reaching this opinion is limited to post-incident investigation reports authored by Detectives Buechler and Haas of the *Ozaukee County Sheriff's Office*. (*Id.*, ¶ 8, Ex. D, pp. 8-10, ¶¶ 22-23). Detective Haas summarized statements in his report attributed to Officers Wolfgram and Weddig regarding the visibility of the cell from the control bubble, which were made *after* this incident occurred. (*Id.*) Sinclair did not explain in his Report or otherwise how he determined that Detective Haas' report confirmed that Officer Weddig and Wolfgram were aware of and formed these opinions about the cell's visibility prior to the assault. Sinclair also could not recall whether he knew of or considered any other similar statements by, or attributed to, other officers or Defendants, and no such statements are discussed in his Report. (*Id.*, ¶ 11, Ex. G, pp. 109:21 – 110:12).

When asked how he determined that Officers Weddig and Wolfgram's post-incident statements meant that every other Defendant was aware of the "commonly known blind spot[,]" Sinclair confirmed he just assumed based on personal experience:

> Well, *based on my experience*, sir, if there is a spot that's difficult to see, then every officer who ever has worked in that post and had that responsibility is going to have experienced it for themself. And so, therefore, *it's pretty easy to assume* that every officer that worked in that post has experienced it. And so that's, *I guess*, a pretty *easy assumption on my part*.

(*Id.*, Ex. G, pp. 110:13 – 111:4) (emphasis added). His Report also does not address how he determined Sheriff Schulties had knowledge of the alleged security gap. Indeed, he did not consider this in reaching

his opinion because he did not know whether any staff had ever reported concerns about the visibility to the Sheriff or any other Jail administrative or managerial staff. (*Id.*, Ex. G, pp. 110:13 – 111:4)

Sinclair should also be barred from offering opinions or testimony about the alleged "blind spot" because it will confuse the jury on material issues and unfairly prejudice Defendants. He confirmed that the term "blind spot," as used in his Report, refers "to the ability to directly observe [Proft's cell] from the control booth." (*Id.*, Ex. G, p. 62:8-23). But Sinclair considered the view of Proft's cell from the camera monitor in the control bubble to be "pretty clear," and he testified that any "blind spot" discussed in his Report was alleviated by the camera view. (*Id.*, Ex. G, pp. 83:4 – 84:11). The phrases "blind spot" and "gap in security" are misleading and will confuse the jury, particularly in relation to Plaintiff's claim under Wisconsin's Safe Place statute. Sinclair's opinion is that Defendants' inattentiveness to the camera monitor during the assault is the reason they did not detect the assault sooner—not because the cell could not be observed from the control bubble. (*See id.*) And for the reasons previously discussed, Sinclair's opinion regarding Defendants' negligence should also be struck.

Sinclair's opinions lack the requisite evidentiary support, and the assumptions of facts upon which his opinions are based are not supported by sufficient facts and data. Instead, they are speculative conclusions Sinclair has assumed based on his personal experiences. Consequently, his opinions present "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). And because his opinions are "connected to the underlying materials only by his *ipse dixit*—his say-so[,]" they are unreliable, will only serve to the confuse the jury and prejudice Defendants, and they should be excluded under *Daubert* and Fed. R. Evid. 702. *See Lyons v. Leatt Corp.*, 322 F.R.D. 327, 337 (N.D. Ind. 2017); *see also Joiner*, 522 U.S. at 146 (*Daubert* and the Federal Rules of Evidence do not require "a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### 2. Sinclair's Opinions Are Not the Products of Reliable Principles and Methods.

Neither of Sinclair's opinions are based on reliable methodology. In opining that Defendant were negligent and derelict in their duties, Sinclair relies primarily on ACA standards to establish the standard of care he opines Defendants breached. However, Sinclair has not demonstrated that these standards reflect widely accepted and applied criteria in jails throughout the country. Rather, his Report provides that the ACA standards "are not a requirement for *most* confinement facilities . . . ." (*Id.*, ¶ 8, Ex. D, p. 11, ¶ 28) (emphasis added). He also testified that "[t]hey're not universally followed by everyone . . . ." (*Id.*, ¶ 11, Ex. G, p. 73:3-4). Nothing in the Report discusses whether the WCJ was subject to or required to follow these standards, and at his deposition, Sinclair did not know if WCJ was required to adhere to the ACA standards. (*Id.*, Ex. G, p. 73:7-12).

Otherwise, Sinclair's opinions regarding the widely accepted standards and expectations for jail correctional staff are based on internal policies and procedures of the WCJ, and his opinions in this regard are "supplemental to . . . Captain Lehman's own stated opinions related to the expectations of corrections staff in that specific jail." (*Id.*, Ex. G, p. 73:21-25). Sinclair is not an expert in WCJ operations, policies, or procedures, and expert testimony is not necessary to assist the jury in understanding those policies and procedures. Further, Sinclair's opinions that Defendants did not act in conformance with WCJ policies are irrelevant to the jury's determination of the claims at issue, particularly Plaintiff's § 1983 claims. "Policies and procedures do not shed light on the reasonableness of an officer's behavior because, 'even if they could be practically assessed by a judge, [such policies] vary from place to place and from time to time . . . .'" *See Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (§ 1983 liability cannot be based on "'violations of state laws or, in this case, departmental regulations and police practices.'") (internal citations omitted).

Accordingly, Sinclair's opinions should be barred for the additional reason that they are not products of reliable principles or methodology.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court grant their *Daubert*

Motion in its entirety and issue an order precluding Sinclair from offering expert opinions or testimony

in this matter.

Dated this 30th day of January, 2026.

CRIVELLO, NICHOLS & HALL, S.C.


By: *s/ Zachary J. Flood*
     SAMUEL C. HALL, JR.
     State Bar No. 1045476
     SARA C. MILLS
     State Bar No. 1029470
     ZACHARY J. FLOOD
     State Bar No. 1099136
     710 N. Plankinton Avenue, Suite 500
     Milwaukee, WI 53203
     Ph: (414) 271-7722
     Fax: (414) 271-4438
     E-mail:  shall@crivellolaw.com
              smills@crivellolaw.com
              zflood@crivellolaw.com

     Attorneys for Defendants Washington County,
     Martin Schulteis, Tim Huybers, Sean Wolfgram,
     Brian Weddig, Andrea Bryant and Gloria
     Baerber