UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF JALEN PROFT,

Plaintiff,

v.

Case No. 24-cv-982-pp

WASHINGTON COUNTY, *et al.*,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 53), DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE (DKT. NO. 64) AND DISMISSING CASE WITH PREJUDICE**

---

This case involves the tragic death of Jalen Proft. On August 17, 2021, Proft was brutally beaten to death by another inmate, George Telford, at the Washington County Jail. The plaintiff's estate sues several officers—Brian Weddig, Sean Wolfgram, Addison Bryant, Tim Huybers and Gloria Baerber—who were on duty at the jail at the time of Proft's death. The plaintiff alleges that the defendant officers were deliberately indifferent to a known danger and violated Proft's constitutional rights under the Fourth and Fourteenth Amendments. The plaintiff also sues Washington County and Sheriff Martin Schulteis, alleging that these two defendants had a policy, or lack of a policy, at the jail that caused the deprivation of Proft's rights under the Fourteenth Amendment.

On January 30, 2026, the defendants filed a motion for summary judgment on each of the plaintiff's claims. Dkt. No. 53. The defendants also

filed a motion to exclude the plaintiff's expert, Stephen Sinclair. Dkt. No. 64. For the reasons explained below, the court will grant defendants' motion for summary judgment and deny as moot their motion to exclude Sinclair's expert testimony.

## I. Background

The defendants—Officers Weddig, Wolfgram, Bryant, Baerber and Huybers—were employees of the Waukesha County Jail during the relevant period. Dkt. No. 76 at ¶¶1-5. They all met the standards and requirements of training for correctional officers established by the State of Wisconsin. Id. at ¶6.

George Telford was booked into the jail on July 4, 2021. Id. at ¶52. Jalen Proft was booked into the jail on August 15, 2021. Id. at ¶44. When an inmate arrives at the jail, he undergoes a classification procedure where jail staff will evaluate his medical issues and risk factors to determine his security status (maximum, medium or minimum) and his assignment to general population, housing unit style and programing. Id. at ¶12. Proft and Telford both were classified as medium security when they were booked into the jail. Id. at ¶¶44-47, 50, 52, 57-58.

The inmate housing area at the jail is referred to as the "Adult Pod." The male Adult Pod consists of eleven housing units, Pods A through K, and two isolation cells. Id. at ¶25. Proft and Telford were assigned to Adult Pod D, which includes six cells. See id. at ¶¶41, 51, 57. Three cells are on a lower floor and three cells are on an upper floor that has a balcony, also referred to as a

tier. Id. at ¶41. A stairway in the pod connects the upper and lower floor cells. See id. at ¶95. Proft was in Cell 1 and Telford was in Cell 2, both of which were located on the upper floor of Pod D. Id. at ¶¶41, 51, 57, 69; see also Dkt. No. 54-6 at 1:29:00-1:29:05.[1]

The jail's eleven male housing units (Pods A-K) encircle a hallway that separates the units from a Control Room. Id. at ¶26. At least one officer is stationed in the Control Room at all times. Id. at ¶27. Officers in the Control Room are responsible for opening and closing doors within the facility, monitoring inmates, monitoring officers who are interacting with inmates, answering intercom calls from within the Adult Pods, answering phone calls, serving meals, delivering mail and handing out cleaning supplies to inmates. Id. at ¶¶31, 75. The centralized location of the Control Room ensures that wherever an officer is positioned, he or she will be facing at least one of the eleven housing units. Id. at ¶26.

At the jail, officers' primary form of inmate monitoring is direct visual observation of the inmates, but officers are not expected to maintain constant visual contact with each inmate. Id. at ¶¶18-19. For inmates housed in the general population, officers check inmate welfare by walking through each housing unit at least once an hour and visually observing each inmate. Id. at

[1] Dkt. No. 54-6 is a surveillance video of Pod D from August 17, 2021 between 11:00am and 2:00pm. The surveillance video includes time stamps, which are cited for reference. But the time stamps displayed on the video are about twenty seconds behind "real time." See Dkt. No. 76 at 13-145 n.3. The referenced citations to the video time stamps refer to the time indicated on the video. The court and the parties have not adjusted the time stamp citations to account for the twenty-second delay.

¶20. Officers assigned to the Control Room also are expected to visually monitor inmates in the Adult Pods. Id. at ¶32; see also Dkt. No. 87 at ¶22.

The parties generally agree that the configuration and design of Pod D and the Control Room contains obstructions (such as metal bars and frames, computer monitors and metal cell doors) that can make it difficult to see into an Adult Pod and the inmates' cells. See Dkt. No. 76 at ¶¶28-29; Dkt. No. 87 at ¶¶13, 63-64. The parties spill a lot of ink disputing the degree to which Proft's jail cell in particular (Cell 1), or any of the other jail cells in Pod D, may have been more difficult for officers to view and monitor depending on various physical obstructions or an officer's specific angle of view. See, *e.g.*, Dkt. No. 87 at ¶¶9-10, 12, 14, 38-41, 45-46, 49, 52, 57-67. For purposes of summary judgment, the court will credit the version that favors the plaintiff as the non-moving party and assume that Proft's jail cell was more difficult to see into and monitor compared with the other cells in Pod D.

In addition to visually inspecting inmates, officers in the Control Room have access to surveillance cameras, door controls and intercoms connecting the Control Room to the inmate housing units. See Dkt. No. 87 at ¶¶28-29, 33-34, 50, 75. The Control Room has two video monitors extending from the ceiling to assist officers with monitoring inmates. Dkt. No. 76 at ¶33. One of the monitors displays live camera feeds into each of the housing units in the male Adult Pod on a single screen. Id. at ¶34. The other monitor displays live feeds of other parts of the jail, such as hallways and the visitation area. Id.; see also Dkt. No. 87 at ¶19. Because the Control Room is separated from the

housing units by multiple panes of security glass and doors, officers' ability to hear what is happening inside any particular housing unit is limited. Dkt. No. 76 at ¶40.

The parties agree that the classification of and interactions between Proft and Telford did not raise any red flags for staff at the jail. Proft did not have any known past or present serious behavior issues or gang affiliations. Id. at ¶48. Proft had one known enemy, but he wasn't incarcerated at the jail in August 2021. Id. at ¶¶48-49. During the six-week period between when Telford was booked into the jail and his assault on Proft, jail staff did not observe or receive any information suggesting that Telford might become violent toward staff or other inmates. See id. at ¶¶59-60.

On August 17, before the assault, Telford and Proft's interactions together did not raise any red flags. At about 12:01 p.m. and 1:05 p.m., Officers Wolfgram and Weddig performed a routine walk-through of Adult D Pod. Id. at ¶¶63, 72, 76. They did not notice anything out of the ordinary during their walkthroughs. Id. At 12:11 p.m., Telford and Proft sat next to each other during lunch without incident. See id. ¶¶64-66. Following lunch and prior to the assault, Telford and Proft went about their normal routines in Pod D. See id. ¶¶67-71. Nothing appeared to be amiss between the two men. Id.

The assault itself transpired over the course of about four minutes from 1:24:45 p.m. to 1:28:40 p.m. See Dkt. No. 54-6. At 1:20 p.m., a few minutes before Telford's assault began, Wolfgram, Bryant, Weddig and Huybers were in the Control Room. Id. at ¶73. Weddig and Wolfgram were assigned to the

Control Room that day. Id. at ¶75. Bryant was working as a "court rover" and was responsible for escorting jail inmates to court. Id. at ¶74. She was preparing to escort an inmate to a court appearance. Id. at ¶79. Huybers was working as a "rover" and was responsible for assisting other officers as needed and sitting in the Control Room while Weddig and Wolfgram were doing their walkthroughs. See id. at ¶¶76-78. Baerber, Bryant, Weddig, Wolfgram and Huybers believe they were discussing work-related matters when they were all assembled in the Control Room. See id. at ¶112.

At 1:22 p.m., Proft was in his cell and lying on his bed. Telford walked into Proft's cell, spoke to him briefly and left. Id. at ¶81. Telford then began pacing back and forth on the upper-level tier without interacting with any inmates in the pod. Id. at ¶82. At 1:24:45 p.m., Telford reentered Proft's cell and immediately began assaulting him. Id.; see also Dkt. No. 54-6 at 1:24:45pm. At about the same time (1:24 p.m.), Baerber joined Wolfgram, Bryant, Weddig and Huybers in the Control Room to get ready to escort another inmate to a court appearance. Id. at ¶83; Dkt. No. 87 at ¶82.

About a minute after Telford's assault began (1:25 p.m.), other inmates in Pod D exited their cells at various times, walked around the pod dayroom and talked with each other. Dkt. No. 76 at ¶85. Some of the inmates glanced at Proft's cell during the assault, but apparently none of them tried to alert jail staff to Telford's assault.[2] Id.; see also Dkt. No. 54-6 at 1:25:25-1:27:50.

[2] The plaintiff cited evidence from one of the Pod D inmates saying that he had heard Proft screaming for someone to help him during the time that Telford was assaulting him in his cell. See Dkt. No. 87 at ¶79 (citing Ex. 39, Dkt. No.

At 1:26 p.m., Bryant exited the Control Room into the surrounding hallway to get an inmate for a video court hearing. Dkt. No. 76 at ¶86. About thirty seconds after Bryant left the Control Room, Baerber left the Control Room to get another inmate for a video court hearing. Id. at ¶87. At 1:27 p.m., Bryant and Baerber began placing restraints on the two inmates they were going to escort to their court hearings. Id. at ¶88. While Bryant was placing restraints on the inmate, she heard yelling, but couldn't tell where it was coming from. Id. at ¶89. She looked into Pod D and saw a couple of inmates in the dayroom, but nothing seemed out of the ordinary. Id. at ¶90. Bryant told Baerber that she thought something was happening in Pod D, but could not see any disturbance. Id. at ¶91. Bryant then alerted Weddig and Wolfgram in the Control Room that she had heard yelling and thought there might be a fight. Id. at ¶93. Weddig looked at the Adult Pod units from the Control Room and initially did not see anything. Id. ¶94.

At 1:27:40 p.m., Proft managed to crawl to the doorway with Telford on top of him face down on the floor. Id. at ¶95. After alerting Weddig and Wolfgram in the Control Room, Bryant saw Proft on the ground with Telford on top of him. Id. at ¶97.[3] Meanwhile in the Control Room, Huybers turned on the

---

78-26). But the evidence of the inmate's statement of what he heard is from an investigative report of an interview with the inmate. The court will not consider this unsupported hearsay evidence. See, *e.g.*, Cairel v. Alderden, 821 F.3d 823, 830 (7th Cir. 2016) (holding that courts cannot consider inadmissible hearsay on summary judgment).

[3] The plaintiff disputes the defendants' proposed finding of fact that "Bryant looked back into Adult D Pod and saw Telford coming out of Proft's cell with Proft on the ground." Dkt. No. 76 at ¶76. But the plaintiff's dispute concerns

intercom in Pod D, heard noise and observed Proft and Telford coming out of the cell in an apparent altercation. Id. at ¶98. When Proft crawled out of his cell, Baerber was also looking around Pod D and saw Proft with swollen eyes. Id. at ¶96. Baerber immediately called a "Code Red, Fight in Adult D Pod," which aired over the security radios at 1:28:19 p.m. Id. at ¶99. When Proft crawled to the doorway, Telford never permitted him to get off the floor. Proft's physical condition left him unable to defend himself against Telford's brutal and unrelenting assault. See Dkt. No. 54-6 at 1:27:52-1:28:40. Standing over Proft, Telford repeatedly struck Proft's head on the floor with the heel of his foot.[4] See id.; see also Dkt. No. 57-1 (Baerber report stating that she observed Telford "stomping on Proft's head with his heel, using what appeared to be full force").

Weddig and Wolfgram saw Telford assaulting Proft when they heard Baerber call the Code Red. Id. at ¶100. Using the intercom, Huybers ordered the inmates in Pod D to lock into their cells. Id. at ¶101. Weddig and Wolfgram ran to the vestibule outside Pod D. Id. at ¶102. Telford did not heed Huybers' lock-in order. Wolfgram yelled through an opening in the Pod D door for Telford to lock into his cell. Id. at ¶103. Bryant and Baerber escorted the inmates they

---

what Officer Baerber, not Bryant, said in her report. See id.; see also Dkt. Nos. 56, 56-1, 57, 57-1. Elsewhere, the plaintiff does not dispute the contents of Bryant's report, see, e.g. id. at ¶104; the court will credit the proposed fact (dkt. no. 76 at ¶76) as undisputed.

[4] Telford was convicted of first-degree intentional homicide for murdering Proft. Telford received a life sentence without any chance of release. See State of Wis. v. Telford Jr., Washington County Case No. 2021CF407 (available at https://wcca.wicourts.gov/).

had been getting ready for court appearances out of the hallway next to the Control Room into separate rooms to secure them. Id. at ¶¶104-05. Weddig grabbed a medical bag and yelled down the hallway for a nurse. Id. at ¶106.

When a Code Red is called, the jail's practice is that the sergeant and all available officers will respond to the area of the call regardless of their assigned location or their seniority. Id. at ¶42. And in an emergency situation in an inmate housing unit, jail practice is that officers will not enter the unit until it is secure and safe to enter. Id. at ¶43.

Consistent with the jail's practice, several officers assembled outside Pod D's entrance but did not enter immediately. Id. at ¶¶107-11. At 1:29 p.m., the assembled officers opened the Pod D door and entered the dayroom. Id. at ¶108. Telford continued to pace the second-floor balcony with Proft motionless on the floor. Id. Officers commanded Telford to lock into his cell. Id. Within ten seconds of opening Pod D, multiple officers entered the dayroom and one of them pointed a taser at Telford as the officers continued to order him to lock into his cell. Id. at ¶109. Telford finally relented and locked into his cell when officers began ascending the stairs to the second-floor tier. Id. at ¶110. As Telford's cell was closing, officers and a nurse went to assist Proft. Id. at ¶111. The nurse and EMTs who arrived shortly after were unable to revive Proft. He died in Pod D. See Dkt. No. 54-6 at 1:30:01-1:41:15.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in

her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## III. Motion for Summary Judgment (Dkt. No. 53)

### A. Counts One and Two—Deliberate Indifference

The plaintiff alleges that defendants Baerber, Bryant, Weddig, Huybers and Wolfgram violated Proft's Fourth and Fourteenth Amendment rights through their deliberate indifference to the risk of harm that Telford posed to Proft. See Dkt. No. 40 at ¶¶94-101.

#### 1. The *Parties' Arguments*

The defendants maintain that the plaintiff cannot establish that any defendant was aware of any specific risk of harm to Proft. The defendants point out that the generalized risk of violence in jails and prisons is not sufficient to show a specific risk of harm for purposes of a deliberate indifference claim. Dkt. No. 62 at 4-5 (citing Thomas v. Dart, 39 F.4th 835 (7th Cir. 2022), and Kemp v. Fulton County, 27 F.4th 491 (7th Cir. 2022)).

The defendants contend that the undisputed facts show that Baerber, Bryant, Huybers, Weddig and Wolfgram did not receive any information suggesting that Telford posed a risk of violence to any inmate, including Proft. The defendants say that during the six-week period between Telford's arrival at the jail and the day of the assault, there was no suggestion from Telford's record or his behavior toward inmates and staff that he posed a risk of violence. Id. at 6-9. On the day of Telford's assault, Wolfgram and Weddig performed their required hourly walkthroughs of the inmate housing units

without incident. And the interactions between Telford and Proft prior to the assault did not suggest that they were not getting along. See id. at 10-11.

The defendants argue that the undisputed facts show that Bryant, Baerber, Wolfgram, Weddig and Huybers were not deliberately indifferent to Telford's assault. The defendants highlight that as soon as Bryant thought she heard noise suggesting there might be a fight occurring in one of the adult pods, she immediately started to investigate and told Baerber—who was nearby in the hallway getting an inmate ready for a court appearance—and the officers in the Control Room what she had heard. Id. at 8-9. When Baerber saw Telford on top of Proft, she immediately called a Code Red. Id. at 9. When Weddig heard Bryant's report of noise suggesting a fight in one of the adult pods, he immediately started to visually scan the units but initially did not see anything. Id. at 10. Huybers turned on the Pod D intercom to investigate Bryant's report of a possible fight, heard noise from the pod and saw Telford and Proft coming out of the cell in an apparent altercation. Id. at 10-11. When Baerber called the Code Red, Weddig and Wolfgram saw Telford assaulting Proft on Pod D's second-floor tier and immediately went to the vestibule outside Pod D to prepare for entry into the housing unit. Id. at 11.

The defendants maintain that Baerber, Bryant, Weddig, Wolfgram and Huybers cannot be held to a standard of perfection with eyes on every inmate in custody at the jail at all times. The defendants argue that the appropriate inquiry for purposes of a deliberate indifference claim is objective reasonableness, which must take into account the actions that the officers did

take. See id. at 12 (citing Pulera v. Sarzant, 966 F.3d 540 (7th Cir. 2020)). They assert that the undisputed facts shows that the actions Bryant, Baerber, Weddig, Wolfgram and Huybers made were objectively reasonable.

The plaintiff argues that a reasonable jury could conclude that Proft's death was the predictable consequence of officers being careless in their jobs. See Dkt. No. 75 at 2. The plaintiff maintains that the defendant officers knew that Proft's cell, in particular, was difficult to observe and that the defendants failed to monitor Proft's cell appropriately. Id. at 2, 10-12. The plaintiff contends that Bryant, Baerber, Weddig, Wolfgram and Huybers could have intervened in Telford's assault earlier and possibly saved Proft's life if they had been paying better attention to Proft's cell. Id. at 4, 6-8. The plaintiff emphasizes the length of Telford's assault, which took place over the course of several minutes. The plaintiff says that a reasonable jury could infer that the defendant officers failed to reasonably monitor and observe inmates and timely intervene in Telford's assault based on the video evidence showing that the defendant officers were talking to each other in the Control Room at the time of the assault. Id. at 8-9.

2. *Analysis*

It is undisputed that Proft was a pretrial detainee and that the Fourteenth Amendment's objective reasonableness standard applies to the plaintiff's conditions-of-confinement claim. See Dkt. No. 3 n.2; Dkt. No. 75 at 4; see also Miranda v. County of Lake, 900 F.3d 335, 350 (7th Cir. 2018); Kemp, 27 F.4th at 495. Under the objective standard for conditions-of-confinement

claims, a defendant would be liable if he or she "acted purposefully, knowingly, or perhaps even recklessly." Kemp, 27 F.4th at 495. But negligent conduct is not enough. See Miranda, 900 F.3d at 353 ("[N]egligent conduct does not offend the Due Process Clause."); Daniels v. Williams, 474 U.S. 327, 330-31 (1986) (a state official's "mere lack of due care" does not "'deprive' an individual of life, liberty, or property under the Fourteenth Amendment."). Objective reasonableness "turns on the facts and circumstances of each particular case." Kemp, 27 F.4th at 495 (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)).

Under the Fourteenth Amendment, jail officials have a duty to take "reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994). This duty includes protecting prisoners from inmate violence. Rice *ex rel.* Rice v. Corr. Med. Servs., 675 F.3d 650, 669 (7th Cir. 2012) ("Jail officials have a duty to protect inmates from violent assaults by other inmates.").

Under Kemp, a pretrial detainee must prove the following elements to support a failure-to-protect claim against an individual officer:

> (1) [t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) [t]hose conditions put the plaintiff at substantial risk of suffering serious harm; (3) [t]he defendant did not take reasonable available measures to abate that risk, *even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved*—making the consequences of the defendant's conduct obvious; and (4) [b]y not taking such measures, the defendant caused the plaintiff's injuries.

Kemp, 27 F.4th at 496 (emphasis in original) (quoting Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (*en banc*)). The court must "not assume that a reasonable officer is omniscient;" rather, "the first step in evaluating whether the defendant should have appreciated the risk of harm is to take inventory of the factual information that he received." Davis v. Rook, 107 F.4th 777, 781 (7th Cir. 2024). The risk a reasonable officer would appreciate must be somehow "specific to a detainee, and not a mere general risk of violence." Thomas, 39 F.4th at 843 (quoting Brown v. Budz, 398 F.3d 904, 909 (7th Cir. 2005)).

Although the facts in Kemp are not on all fours with the circumstances in this case, the Seventh Circuit's analysis of the plaintiff's failure-to-protect claim is instructive. In Kemp, 27 F.4th at 492-93, the plaintiff, a jail detainee, was beaten by three inmates after he got into an argument with one of them and another inmate threatened him. The plaintiff did not tell any of the officers about the threat; instead he confronted the other inmates, which led to the assault on him that lasted several minutes. Id. The plaintiff yelled for help, but none of the officers—one of whom was hearing impaired and not wearing his hearing aid—heard him. Id. at 493-94. After the fight ended, the three inmates told the plaintiff they were done, but they apparently changed their minds and beat the plaintiff again about twenty minutes later leaving the plaintiff unconscious on the floor. Id. at 493. The plaintiff argued that the hearing-impaired officer's decision not to wear his hearing aid while on duty put the plaintiff at a substantial risk of injury. Affirming the district court's decision

granting summary judgment, the Kemp court agreed in part with the plaintiff that there was enough evidence to show that the defendant "intentionally chose not to wear his hearing aid on the day of the fight," even if he did not appreciate the risk of harm from that choice. Id. at 497. But the court held that summary judgment was warranted because there was no evidence that the defendants "should have been on notice of a substantial risk to [the plaintiff]'s safety" because "he never reported his verbal disagreement . . . or the ensuing threats" from the three inmates who later attacked him and "prior to the beating, all four men had cohabited peacefully for months." Id.

In this case, the plaintiff must show that the defendant officers actually received "all the information about a potential health or safety risk" to demonstrate that a reasonable officer in the defendants' shoes would have "put the puzzle pieces together" about the risk of harm to the plaintiff. See id., at 496. The plaintiff has not made a sufficient showing to demonstrate that a reasonable officer in Bryant, Baerber, Weddig, Wolfgram or Huybers' shoes would have appreciated the existence of a substantial risk of harm to Proft.

There is no evidence showing that any of the defendant officers—Bryant, Baerber, Weddig, Wolfgram or Huybers—had knowledge of any potential risk that Telford would become violent toward Proft. And the plaintiff does not argue that any of the defendant officers had any such knowledge of a specific risk of violence from Telford to anyone, much less Proft. There also is no evidence showing that any of the defendant officers acted purposefully or knowingly regarding Telford's assault of Proft. There is no suggestion that any of the

officers ignored the need to intervene in Telford's assault when they became aware the assault was occurring. It is undisputed that Bryant thought she heard yelling, indicating to her that there might be a fight in one of the inmate housing units. Bryant immediately told Baerber who was in the hallway surrounding the Control Room what she heard, putting Baerber on alert of a possible fight. Bryant also alerted Weddig and Wolfgram in the Control Room of a possible fight. Weddig and Wolfgram then started scanning the inmate housing units and Huybers, who was also in the Control Room, turned on the intercom to Pod D to listen for signs of a fight. It is undisputed that Baerber was the first to observe Telford assaulting Proft on the Pod D balcony and that she immediately called a Code Red. When Baerber called the Code Red, the officers immediately took steps to secure Pod D by ordering the inmates to lock into their cells and assembling to safely enter Pod D consistent with the jail's practices.

None of this shows that the defendant officers ignored Proft's plight when they were alerted to possible signs of, and then had visual confirmation of, Telford's assault. Once the defendant officers became aware of Telford's assault, there is no dispute that they immediately took steps to intervene—calling a Code Red, ordering inmates to lock into their cells, ordering Telford back into his cell, assembling to safely enter the pod to secure it and providing medical attention to Proft when the pod was secured. The fact that the officers did not immediately enter the pod to intervene with Telford's assault does not constitute deliberate indifference. <u>See</u> <u>Guzman v. Sheahan</u>, 495 F.3d 852, 858

(7th Cir. 2007) ("A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put her in significant jeopardy."); see also Shields v. Dart, 664 F.3d 178, 181-82 (7th Cir. 2011) (holding that officer who took steps to intervene in inmate fight by calling for backup and monitoring fight from secure area until other officers arrived was not deliberately indifferent even when officers delayed arriving to scene of fight by fifteen to twenty minutes); Peate, 294 F.3d at 882 (prison officials who had actual awareness of a substantial risk to the health or safety of an inmate incur no liability if they "responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent").

Absent any evidence of the defendant officers' purposeful or knowing conduct, the court is left with recklessness. The plaintiff argues that the defendants were aware that Proft's Cell 1 in Pod D was more difficult to see into compared with others. The plaintiff's recklessness theory appears to rest on two predicates: (1) that officers were "loafing" on the job and (2) that their inattentiveness caused the plaintiff's injuries because the officers failed to intervene earlier.

Mere inattentiveness is negligence, which isn't sufficient to prove a constitutional failure-to-protect claim. Miranda, 900 F.3d at 353. To avoid this conclusion, the plaintiff maintains that the officers should have been even more attentive to the risks inherent in Cell 1 (as the allegedly harder-to-

monitor cell) and that their lack of attentiveness was reckless in the face of the known risk that Cell 1 was harder to monitor. Although it is possible that Proft's jail cell in Pod D may have been more difficult for officers to view and monitor, the plaintiff has not provided any evidence that a reasonable guard would have been on notice of a specific substantial risk of violence to Proft *because* he was housed in Cell 1. None of the defendant officers were responsible for the construction of the jail and none were responsible for the obstructions inherent in designing a jail to securely house a population of detained persons. The plaintiff also has not presented any evidence that there had been a pattern of inmates in Cell 1 being assaulted or that there was a pattern of officer's delayed reaction in detecting violence occurring in Cell 1 due to the greater difficulty in monitoring that cell.

The plaintiff conflates an officer's awareness that Proft's jail cell was more difficult to view and monitor with awareness of a specific substantial risk to Proft's safety because of his assignment to Cell 1. Those are two different things. The fact that a jail cell may be more difficult to view and monitor as compared with other cells does not put a reasonable officer on notice that the cell's occupant is at substantial risk of an assault from another inmate or that an assault was more likely to occur in that particular jail cell. See Thomas, 39 F.4th at 843 (stating that plaintiff could not "assert an appreciable risk of harm based solely on his placement in the Jail's general population because the 'general risks of violence in prison' confront virtually every detainee." (quoting Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000)). Here, there is no

evidence in the record that inmates at the jail generally were aware that Cell 1 was more challenging for officers to monitor and that Cell 1 would be an ideal location to assault an inmate, posing a greater risk to Cell 1's occupant. Nor is there any evidence that jail officers routinely failed to detect assaults occurring in Cell 1 or that the existing policies and tools available to jail officers to monitor inmates were inadequate to address the harder-to-monitor risks that were unique to Cell 1.

Without any evidence that Telford posed a specific risk of violence toward Proft, or any evidence that any of the defendant officers should have been on notice of a substantial risk to Proft's safety because of his assignment to Cell 1 in Pod D, a reasonable jury could not conclude that the defendant officers' actions were objectively unreasonable. As for the plaintiff's contention that the defendant officers were "loafing" on the job, evidence that the officers were inattentive would constitute negligence (at most), which cannot sustain the plaintiff's constitutional failure-to-protect claims. See Miranda, 900 F.3d at 353; Daniels, 474 U.S. at 330-31. The court will grant the defendants' motion for summary judgment as to Counts One and Two asserted in the Second Amended Complaint.[5]

[5] Because the court will grant the defendants' motion for summary judgment based on undisputed facts as a matter of law, the court will not address the defendants' alternative argument for summary judgment based on qualified immunity, see dkt. no. 62 at 17-20.

B. Count Three (Municipal Liability)

The plaintiff alleges that defendants Washington County and Sheriff Schulteis violated Proft's Fourteenth Amendment rights through their deliberate indifference to his safety, which was the result of customs, practices and policies of Washington County and Schulteis. See Dkt. No. 40 at ¶¶109-10. The plaintiff alleges that Washington County and Schulteis failed to have an adequate surveillance camera system in the jail that would have allowed a guard to see the assault earlier. See id. at ¶125. The plaintiff alleges that Washington County and Schulteis maintained a policy, custom or practice of failing to provide the jail with properly trained personnel to monitor inmates and that this contributed to the violation of Proft's Fourteenth Amendment rights. See id. at ¶¶113-16. The plaintiff also alleges that jail staff failed to properly provide a mental health screening of Telford and that this failure was a result of Washington County and Schulteis' policies, customs or practices. See id. at ¶¶110, 120, 126.

1. *Parties' Arguments*

Defendants Washington County and Schulteis (the Monell defendants[6]) argue that summary judgment is warranted on the plaintiff's municipal liability claim because there is no evidence the plaintiff can rely on to establish that these defendants had a policy, practice or custom that would support a claim that Proft's constitutional rights were violated. Dkt. No. 62 at 21. The Monell

[6] Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978).

defendants maintain that there is no evidence that the jail's screening of Telford's or Proft's mental health or the jail's classification of Telford and Proft as medium security risks was deficient. See id. at 21-27. They also argue that the plaintiff's municipal liability claim based on the adequacy of the jail's video surveillance system fails because there is no evidence that the quality or adequacy of the surveillance system had any causal connection with Proft's death. Id. at 22.

In its response, the plaintiff does not engage with any of these arguments asserted by the Monell defendants in their opening brief. Instead, the plaintiff argues that Washington County and Schulteis were on notice that Proft's jail cell, Cell 1, was difficult to monitor and that the Monell defendants failed to address this known safety hazard by essentially ignoring a problem that was obvious to the jail's officers. Dkt. No. 75 at 19. The plaintiff argues that the Monell defendants' lack of a policy to adequately monitor Cell 1 led to the violation of Proft's constitutional rights. Id. at 19-20. The plaintiff also maintains that there is sufficient evidence to establish that Washington County and Schulteis knew about Cell 1's monitoring challenge, citing testimony of several officers who worked at the jail.[7] See id. at 21-22.

---

[7] The plaintiff also cites testimony of Washington County's Rule 30(b)(6) corporate designee in support of its Monell claim. Dkt. No. 75 at 20-21. The defendants vigorously dispute the plaintiff's reliance on the corporate testimony because they argue that the testimony is inadmissible. See Dkt. No. 86 at 8-9; see also Dkt. No. 87 at ¶85.

In the plaintiff's proposed findings of fact, the plaintiff proffered that Scott Lehman, Washington County's corporate designee, "acknowledged that, according to records at the jail, 'Schulteis knew, that Cell No. 1 in D Pod is . . .

The Monell defendants reply that the plaintiff's evidence about a purported lack of a policy for monitoring Proft's cell is contradicted by the undisputed facts. They point out that the plaintiff does not dispute that the jail had policies and procedures in place for inmate safety checks (*e.g.*, hourly walkthroughs of the inmate pods) (dkt. no. 76 at ¶¶17, 20), regular inmate monitoring through visual inspection and use of the jail's surveillance cameras to assist with monitoring (id. at ¶¶18-19, 32-33) and calling a Code Red in the case of an inmate fight (id. at ¶¶42-43). See Dkt. No. 86 at 9. And the defendants emphasize the lack of any dispute that the defendant officers met the standards and requirements of training for correctional officers on the policies and procedures applicable to the jail. See id.; Dkt. No. 76 at ¶6.

---

one spot cameras have a hard time seeing,' and that this was 'the worst area in the tier for a fight to happen because the door, when open, covers the majority of the left side of the cell where the bunk is.'" See Dkt. No. 87 at ¶85; see also Dkt. No. 54-8 at 109 (S. Lehman Dep. 259:11-21).

Reviewing the testimony, it is apparent that the plaintiff's counsel was reading a portion of the plaintiff's complaint to Lehman and that Lehman acknowledged that was what the complaint's allegation said. But Lehman's acknowledgment of what the complaint alleged does not provide sufficient foundation to support a factual finding that Schulteis knew that Proft's jail cell was "the worst area in the tier for a fight to happen."

The plaintiff did not cite any evidence, other than Lehman's testimony, in support of this proposed fact. Although the court must view the record in favor of the non-moving party on summary judgment, the court cannot credit facts that are not supported by admissible evidence. See Fed. R. Civ. P. 56(c); Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment.").

2. *Analysis*

In Monell, 436 U.S. 658, the Supreme Court held that municipalities are "person[s]" who may be sued under §1983, but that municipalities are not vicariously liable for the constitutional torts of their employees or agents. See id. at 691-94. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. A municipality is liable under §1983 only "for its own violations of the federal Constitution and laws." First Midwest Bank *ex rel.* LaPorta v. City of Chicago, 988 F.3d 978, 986 (7th Cir. 2021).

A §1983 plaintiff must always show "that he was deprived of a federal right" and must trace the deprivation to some municipal action such that the challenged conduct is "properly attributable to the municipality itself." Id. at 986-87. Municipal actions that may give rise to municipal liability under §1983 include "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." Id. at 986 (quoting Spiegel v. McClintic, 916 F.3d 611, 617 (7th Cir. 2019)). "Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" Dean v. Wexford Health Sources, Inc., 18 F.4th 214, 235 (7th

Cir. 2021) (quoting Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*)).

A §1983 plaintiff also must show that "'the policy or custom demonstrates municipal fault,' i.e., deliberate indifference," which the Seventh Circuit has characterized as a "high bar." Id. (quoting LaPorta, 988 F.3d at 986)). When a municipality's action is not facially unconstitutional, the plaintiff "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." LaPorta, 988 F.3d at 987.

A §1893 plaintiff further must show that the municipal action was the "moving force" behind the civil rights violation. Id. (quoting Bd. of C'nty Comm'rs v. Brown, 520 U.S. 397, 404 (1997)). "Like the heightened showing of municipal fault, this rigorous causation standard guards against backsliding into respondeat superior liability." Id. To satisfy this heightened showing, the plaintiff "must show a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." Id. (citing Brown, 520 U.S. at 404).

"In short, a Monell plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." Dean, 18 F.4th at 235.

The plaintiff has not provided sufficient evidence on which a jury could reasonably conclude that the Monell defendants' actions—or in this case, lack

of action—would lead to a constitutional violation or that they consciously disregarded those consequences. First, there is no evidence that the Monell defendants were aware of the harder-to-monitor challenges unique to Proft's jail cell. Second, there is no evidence of a prior pattern of similar constitutional violations.

The plaintiff's claim of municipal liability hinges on its argument that the Monell defendants were deliberately indifferent to the greater security risk unique to Proft's jail cell by failing to institute a policy or procedure for jail staff to address that security risk. To support a Monell claim, it is "usually necessary . . . to introduce evidence of a prior pattern of similar constitutional violations." Dean, 18 F.4th at 234. The Seventh Circuit has explained that "a pattern of violations may show that the policy itself, 'rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.'" Id. at 236 (quoting Brown, 520 U.S. at 407-08).

The plaintiff failed to show any evidence of a pattern of violations that would lead a jury to conclude that the Monell defendants should have been on notice that Proft's harder-to-monitor cell posed a substantial risk that needed to be addressed and that the lack of a policy was the "moving force" behind Proft's injury. And the officer's knowledge of a specific risk—here, Proft's harder-to-monitor jail cell—cannot be imputed to either of the Monell defendants; to do so would be contrary to the Seventh Circuit's admonition against "backsliding into respondeat superior liability." See LaPorta, 988 F.3d

at 987; see also Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."); Jones v. City of Chicago, 787 F.2d 200, 204 (7th Cir. 1986) ("[T]here must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation.").

In Dean, the Seventh Circuit acknowledged that the risk of a constitutional violation "could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations," but opined that such a case would be "rare." See id. (quoting Connick v. Thompson, 563 U.S. 51, 64 (2011)). Though the circumstances of Proft's death are appalling, this is not that rare case. Although the plaintiff cites testimony from several of the jail officers acknowledging that Proft's cell could be more challenging to monitor, there is no evidence that the Monell defendants had any awareness of it.

It is also doubtful that the harder-to-monitor risk posed by Proft's cell can be characterized as a patently obvious substantial risk that demanded a response. Every prison and jail contains obstructions and hard-to-view areas that may make it more difficult for guards to monitor. But a blind spot doesn't automatically amount to a substantial risk that will predictably lead to a constitutional violation if not addressed. Every car has blind spots that limit a driver's field of view. That's why drivers are expected to maneuver their field of

view to look at the known blind spot before changing lanes. Here, jail officers monitoring Pod D had a general awareness that certain parts of the adult pod could be more challenging to see clearly depending on where they were situated. But they were expected to adjust their point of view to get a better sightline to monitor the inmates in the pod. Without a prior pattern of delayed reactions to a fight, jail officers (and the Monell defendants) had no reason to believe the existing policies and practices used to monitor jail inmates—hourly walkthroughs and regular visual monitoring from the Control Room assisted by the jail's video surveillance system—were inadequate.

Because a reasonable jury could not conclude that Bryant, Baerber, Weddig, Wolfgram and Huybers' actions were objectively unreasonable, the court will grant the defendants' motion for summary judgment as to Count Three asserted in the Second Amended Complaint.

C. Counts Four (Failure to Train), Five (Wrongful Death), Six (Safe Place) and Seven (Negligence)

The plaintiff asserted several state claims along with its §1983 claims. The plaintiff alleges that the Monell defendants failed to properly train and supervise officers at the jail and that this led to Proft's injuries. See Dkt. No. 40 at ¶¶132-37. The plaintiff alleges a wrongful death claim under Wis. Stat. §895.04 and violation of Wisconsin's safe place statute under Wis. Stat. §101.11. See id. at ¶¶141-43, 145-50. And the plaintiff asserts a general negligence claim under Wisconsin law. See id. at ¶¶152-58.

1. *The Parties' Arguments*

The defendants argue that each of the plaintiff's state law claims are barred by the discretionary immunity doctrine under Wis. Stat. §893.80(4). They assert that each of the acts that are the subject of the plaintiff's claims involved the discretionary exercise of judgment and were not ministerial. Dkt. No. 62 at 28-30.

The plaintiff argues that the defendants' acts were not discretionary because a jail policy manual outlined how officers should monitor inmates. The plaintiff contends that the policy manual imposed an obligation that officers must "always monitor inmates" and that the policy did not permit officers to "abandon observation of the pods altogether." Dkt. No. 75 at 27-28. The plaintiff also argues that the discretionary immunity doctrine does not apply to known and compelling dangers that are almost certain to cause injury. The plaintiff maintains that the known difficulty in observing Proft's jail cell presented a compelling danger that was almost certain to cause injury. Id. at 28-30.

2. *Analysis*

This court has original jurisdiction over the plaintiff's federal constitutional claims under 28 U.S.C. §1331, under the federal question doctrine. Although as courts of limited jurisdiction, federal courts generally do not have subject-matter jurisdiction over state-law claims absent diversity, 28 U.S.C. §1367(a) grants district courts "supplemental jurisdiction" over related state-law claims "in any civil action of which the district courts have original

jurisdiction, when those state-law claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." This federal court has supplemental jurisdiction over the plaintiff's state-law claims.

That said, §1367(c)(3) gives district courts the discretion to decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." "A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary." Coleman v. City of Peoria, Ill., 925 F.3d 336, 352 (7th Cir. 2019) (citations omitted). And '[a]bsent unusual circumstances, district courts relinquish supplemental jurisdiction over pendant state law claims if all claims within the court's original jurisdiction have been resolve before trial." Id. (citations omitted). So this court has the discretion to decline to exercise its supplemental jurisdiction over the plaintiff's state-law claims, and it considered doing so.

But given the loss suffered by the plaintiff's loved ones and the extreme nature of the injury involved, the court elects to exercise its discretion to address the state-law claims. The court agrees that the plaintiff's state law claims are barred by the discretionary immunity doctrine and that summary judgment on the plaintiff's state law claims is warranted.

Wisconsin's discretionary immunity statute, Wis. Stat. §893.80(4), grants immunity to public officers for discretionary actions taken within the scope of their employment. See Kierstyn v. Racine Unified School Dist., 228 Wis. 2d 81, (1999) (stating that under Wis. Stat. §893.80(4), "[p]ublic officers or

employees"—and the governmental entities that employ them—"enjoy immunity from liability for injuries resulting from the performance of any discretionary act within the scope of their governmental employment."). A "discretionary" act is distinguished from an act that is purely "ministerial." While discretionary acts generally enjoy immunity, ministerial acts may give rise to liability. See Ottinger v. Pinel, 215 Wis. 2d 266, 273 (Ct. App.1997). A discretionary act involves the "exercise of judgment in the application of a rule to specific facts." Willow Creek Ranch, LLC v. Town of Shelby, 235 Wis. 2d 409, 425 (2000). "A ministerial act, by contrast, involves a duty that 'is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.'" Id. (quoting C.L. v. Olson, 143 Wis. 2d 701, 711-12 (1988)). In assessing whether an act is discretionary or ministerial, "it is the nature of the specific act upon which liability is based, as opposed to the categorization of the general duties of [the] public officer, [that] is determinative of whether [the] officer is immune from liability." Olson, 143 Wis. 2d at 716.

The court first will address the plaintiff's claim under Wisconsin's safe place statute, Wis. Stat. §101.11. The Wisconsin Court of Appeals has addressed §101.11 and its applicability to jail facilities and concluded that the "duty imposed by the safe-place statute, § 101.11, Stats., is discretionary." Spencer v. County of Brown, 215 Wis. 2d 641, 649-52 (Wis. Ct. App. 1997), abrogated in part on other grounds by Blum v. 1st Auto & Cas. Ins. Co., 326

Wis. 2d 729 (Wis. 2010)); see also Nusse v. W. Tech. Coll., 980 N.W.2d 497 (Table), 2022 WL 3452298, at *3 (Wis. Ct. App. 2022); Thomas v. Corr. Healthcare Companies, Inc., No. 15-CV-633, 2016 WL 7046795, at *5-6 (E.D. Wis. Dec. 2, 2016) (holding that defendant's duty under Wis. Stat. §101.11 to determine what measures were reasonably necessary to protect Racine County Jail inmates from harm was discretionary, not ministerial).

Section 101.11 does not define with specificity what measures a jail facility must take to protect the safety of inmates housed in it. The duty imposed by §101.11 for Sheriff Schulteis, and by extension Washington County, to determine what measures were reasonably necessary to protect the safety of the jail's inmates is discretionary. Because the duty imposed by §101.11 is discretionary, the plaintiff's claim against the Monell defendants based on the safe place statute is barred by Wis. Stat. §893.40(4).

The court next will address the plaintiff's failure-to-train-and-supervise claim asserted in Count Four of the second amended complaint. Decisions about how to train and supervise jail staff are inherently discretionary decisions. See Sheridan v. City of Janesville, 164 Wis. 2d 420, 429-30 (Wis. Ct. App. 1991) (holding that the plaintiff's claim against municipality was barred by discretionary immunity because the "city's training and supervision of its police officers concerning conduct during arrests of disabled persons involves governmental discretion"); Wedgeworth v. Harris, 592 F. Supp. 155, 162 (W.D. Wis. 1984) (discretionary immunity applied to city officials' conduct regarding the supervision, training and hiring of police officers because these kinds of

"actions or inactions involve[e] the exercise of discretion and judgment"). The Monell defendants' decisions regarding the training and supervision of jail staff were discretionary, not ministerial. Accordingly, the plaintiff's failure-to-train claim asserted in Count Four is barred by discretionary immunity. The failure-to-train claim does not have merit in any event because it is undisputed that the defendant officers met the standards and requirements of training for correctional officers. See Dkt. No. 76 at ¶6.

Now for the plaintiff's wrongful death and negligence claims. The plaintiff's argument that the defendant's actions as to how to monitor inmates were ministerial because of a jail policy manual is unpersuasive. The specific policy on which the plaintiff relies, Policy 504, concerns inmate safety checks. The purpose of this policy is to "establish a requirement for conducting visual safety checks at least every 60 minutes for all inmates."[8] See Dkt. No. 55-4 at 1. The policy itself provides that

> All correctional staff shall conduct safety checks at least once every 60 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification. Safety checks shall be made through direct visual observation. Cameras and monitors may supplement the required visual observation safety checks but they shall not replace the need for direct visual observation. Safety checks will be clearly documented on permanent logs . . . .

Id.

The only part of this policy that could be characterized as ministerial is the portion stating that officers are required to do a visual safety check on all

[8] The defendants do not dispute the existence or contents of the policy. See Dkt. No. 87 at ¶77.

inmates at least once every hour. Stann v. Waukesha County, 161 Wis. 2d 808, 816 (Wis. Ct. App. 1991) ("[A] ministerial act is one which is "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion."). Assuming that that policy imposed a ministerial duty, the plaintiff's claim based on the policy has no merit because there is no dispute that the defendants complied with this policy. Officers Wolfgram and Weddig did a visual walkthrough of Pod D where Proft was located at about 12:01 p.m. and again at 1:05 p.m. Dkt. No. 76 at ¶¶63, 72. There also is no dispute that at least one officer was in the Control Room to visually monitor inmates on the day of Proft's assault. See id. at ¶¶73, 75-78.

The kind of duty the plaintiff says the jail should have performed is not supported by the policy's text.[9] Policy 504 does not impose a ministerial duty that jail officers must "always" or "continuously" monitor inmates. It says that officers must do a visual safety check at least once every hour. The policy doesn't require officers to "continuously" visually inspect every inmate at all times, twenty-four hours a day. The plaintiff's attempt to shoehorn a ministerial duty of "constant" visual inspection of inmates into Policy 504 is not persuasive. And to the extent that the plaintiff argues that the defendants had

---

[9] The plaintiff's argument also is inconsistent with the facts the plaintiff agreed were undisputed. See Dkt. No. 76 at ¶19 (undisputed that "[jail] officers *are not expected to maintain constant visual contact* with each inmate housed in the Adult Pod" (emphasis added)).

a general duty to monitor inmates, the plaintiff's claim is barred by discretionary immunity because the frequency, timing and mode of monitoring inmates housed in eleven different pods is subject to discretion and judgment.

Nor is the plaintiff's argument that discretionary immunity is inapplicable based on the known and compelling danger exception persuasive. This exception applies only in circumstances where the danger is "compelling enough that a self-evident, particularized, and non-discretionary municipal action is required." Lodl v. Progressive Northern Ins. Co., 253 Wis. 2d 323, 344 (Wis. 2002). An illustration of a compelling danger is the case where a teacher is sexually assaulting a student. A school official who becomes aware of the abuse is obligated to report it and will not be protected by discretionary immunity because the danger is compelling enough to demand a specific action. See, *e.g.*, Baumgardt v. Wausau Sch. Dist. Bd. of Educ., 475 F. Supp. 2d 800, 811-13 (W.D. Wis. 2007) (denying motion to dismiss based on discretionary immunity because immunity would not apply under compelling danger exception where plaintiff alleged that school officials were aware of sexual abuse of a student and failed to report it).

The plaintiff focuses on the defendants' awareness that Proft's cell was more challenging to monitor compared with others. This is not sufficient for the compelling danger exception to apply. The mere difficulty for officers to monitor an inmate in a particular cell due to structural components inherent in all jails and prisons—metal doors, metal bars, safety glass, *etc.*—is not a danger that is so obvious and compelling that it demands a specific and immediate action.

This conclusion is reinforced by the fact that officers at the jail still were able to see into Proft's cell, even if it was partially obscured by the cell door. Once the defendant officers became aware of Telford's assault, they had a duty to respond and discretionary immunity would not apply if the defendants had simply stood by and done nothing. But that is not what happened. The defendant officers responded immediately to Telford's assault by calling a Code Red, ordering Telford to lock into his cell and taking steps to secure Pod D to provide medical treatment to Proft. Under these circumstances, a reasonable jury could not conclude that the compelling danger exception applies.

Because the court concludes that discretionary immunity bars the plaintiff's state law claims, the court will grant the defendants' motion for summary judgment on Counts Four, Five, Six and Seven of the Second Amended Complaint.

## IV. Motion to Exclude (Dkt. No. 64)

The defendants filed a motion to exclude the plaintiff's expert, Stephen Sinclair. Dkt. No. 64. Because the court is granting the defendants' motion for summary judgment, the defendants' motion to exclude is moot. It is also unnecessary for the court to address the motion to exclude because the plaintiff did not rely on any of Sinclair's expert opinions in responding to the defendants' motion for summary judgment.

## V. Conclusion

What happened to Jalen Proft never should have happened. It was horrific and heartbreaking and bewildering. Nothing in this court's decision is

meant to trivialize the terrible tragedy suffered by Mr. Proft and the loss to those who love him and miss him and want justice for what happened to him. But the facts and the law do not support the conclusion that the defendants named in this suit violated Mr. Proft's constitutional rights or violated state law.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 53.

The court **DENIES AS MOOT** the defendants' motion to exclude. Dkt. No. 64.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 28th day of September, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**